# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 6, 2015        Decided August 14, 2015

No. 14-5125

ANNA JACQUES HOSPITAL, ET AL.,
APPELLANTS

v.

SYLVIA MATHEWS BURWELL,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-00053)

*Keith D. Barber* argued the cause for appellants. With him on the briefs were *N. Kent Smith* and *Amy L. Brown*.

*Katherine T. Allen*, Attorney, U.S. Department of Justice, argued the cause for appellee. On the brief were *Ronald C. Machen*, *Jr.*, U.S. Attorney at the time the brief was filed, and *Michael S. Raab*, Attorney. *Samantha L. Chaifetz*, Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney, entered appearances.

Before: KAVANAUGH, MILLETT and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*:  The Medicare Act, 42 U.S.C. §§ 1395 *et seq.*, established a nationwide, federally funded health insurance program for the elderly and individuals with disabilities.    Unsurprisingly, reimbursing hospitals for Medicare services provided to patients across the entire United States is a complicated business.  One reason is that the cost of providing such care can vary significantly depending on where a hospital is located.  An influential factor in that variation is the wages paid to hospital employees, which fluctuate based on the cost of living in different geographic areas.  To help compensate for those disparities, the Medicare Act charges the Secretary of Health and Human Services with computing annually a "wage index" that compares hospital wages within defined geographic areas to a national average, and adjusts Medicare reimbursements accordingly.

This case arises from the Secretary's decision in 2005 to change the boundaries of the geographic areas used to compute those regional wage indices.  The new lines fell in a way that left three multi-campus hospitals straddling different geographic areas.  One is the Southcoast Hospital Group, which found itself with campuses in both the Boston-Quincy, Massachusetts region and in the neighboring Providence-New Bedford-Fall River ("Providence") region.[1]  Consistent with longstanding agency regulations, the Secretary factored all of Southcoast's wages into the Boston-Quincy index because that is where its principal campus with the group's Medicare provider and reporting number was situated.  Concerned that the inclusion of wages from the Providence-area campuses lowered their wage index and thus their Medicare reimbursements, a group of hospitals challenged the

---

[1]  Providence is in Rhode Island; New Bedford and Fall River are in Massachusetts.

Secretary's decision to include wage data from Southcoast campuses outside the Boston-Quincy area in calculating the index for that area for fiscal years 2006 and 2007.

We uphold the Secretary's decision. The Secretary's treatment of Southcoast hewed to the existing administrative treatment of such multi-campus hospital groups. And reasonably so—there were substantial informational and operational obstacles to implementing a different computational method quickly in 2006 or retroactively now. Moreover, appellants admit that the temporary effect of Southcoast's multi-campus data on the wage index was a "one-off" occurrence arising from "unusual circumstances" that apparently did not affect any other multi-campus hospital group's treatment. Oral Arg. Tr. 52–53. Nothing in the Medicare Act or established principles of administrative review mandate that the Secretary individually tailor one hospital's reporting treatment to fit plaintiffs' preferred computational outcome.

# I

## Statutory and Regulatory Framework

As has oft been noted, Medicare is a "complex and highly technical regulatory program." *Thomas Jefferson University v. Shalala*, 512 U.S. 504, 512 (1994) (citation omitted). The Medicare program is administered by the Centers for Medicare and Medicaid Services ("Centers"), a division of the Department of Health and Human Services, under the executive management of the Secretary of Health and Human Services. *St. Elizabeth's Medical Center of Boston, Inc. v. Thompson*, 396 F.3d 1228, 1230 (D.C. Cir. 2005). As part of the program, health care providers are reimbursed for certain costs that they incur in treating Medicare beneficiaries.

*Methodist Hospital of Sacramento v. Shalala*, 38 F.3d 1225, 1227 (D.C. Cir. 1994).

Originally, health care providers were reimbursed for the "reasonable costs" of services furnished to Medicare patients. *Methodist Hospital*, 38 F.3d at 1227. In 1983, Congress substantially revised that payment regime and created the Prospective Payment System. *See* Social Security Amendments of 1983, Pub. L. No. 98-21, § 601, 97 Stat. 65, 149; *see also Methodist Hospital*, 38 F.3d at 1227. The Prospective Payment System reimburses hospitals for medical care requiring at least one night's stay on the basis of a pre-established formula, regardless of the actual costs incurred by the hospital. 42 U.S.C. § 1395ww(d); *see generally Anna Jaques Hospital v. Sebelius*, 583 F.3d 1, 2 (D.C. Cir. 2009). The payment rates are tied to the national average cost of treating a patient's particular ailment. *See* 42 U.S.C. § 1395ww(d). Congress intended for those rates to "reform the financial incentives hospitals face [and] promot[e] efficiency in the provision of services[.]" *Methodist Hospital*, 38 F.3d at 1227 (quoting H.R. Rep. No. 25, 98th Cong., 1st Sess. 132 (1983)).

In calculating those standard payments, the Secretary is required to adjust the "proportion" of the payment attributable to "wages and wage-related costs" for "area differences in hospital wage levels[.]" 42 U.S.C. § 1395ww(d)(3)(E)(i). To ensure uniformity in the adjustment process, the statute requires the Secretary to compute a "factor" that "reflect[s] the relative hospital wage level in the geographic area of the hospital compared to the national average[.]" *Id.* That "factor" is commonly referred to as "the wage index." *Southeast Alabama Medical Center v. Sebelius*, 572 F.3d 912, 914–915 (D.C. Cir. 2009); *see also* Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2006

Rates ("Final 2006 Rules"), 70 Fed. Reg. 47,278, 47,281 (Aug. 12, 2005) ("The base payment rate is comprised of a standardized amount that is divided into a labor-related share and a nonlabor-related share. The labor-related share is adjusted by the wage index applicable to the area where the hospital is located[.]").

The wage index must be updated each year "on the basis of a survey" of the wage-related costs for hospitals in the United States. 42 U.S.C. § 1395ww(d)(3)(E)(i). The Secretary collects annual cost reports from each hospital, *see Anna Jaques*, 583 F.3d at 3; 42 C.F.R. § 413.20(b), and she publishes a manual to guide hospitals through the reporting process, *see* Centers for Medicare & Medicaid Services, Medicare Provider Reimbursement Manual ("Reimbursement Manual"), Part 2, Chapter 1 §§ 100 *et seq.*[2] Generally, each hospital or facility that has been assigned its own Medicare provider number must file its own report. *Id.* § 112 ("Each provider in a chain organization or other group of providers, except as noted below, must file a separate, individual cost report.").[3]

A different rule applies, however, for multi-campus hospitals. A multi-campus hospital is an organization with multiple facilities that operates as a single institution with

---

[2]     *Available     at*     http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Paper-Based-Manuals-Items/CMS021935.html (last visited Aug. 11, 2015).

[3]  Each entity that has been certified to participate in the Medicare program is assigned a unique numerical identifier for use in the full range of Medicare filings and transactions. *See generally* HIPAA Administrative Simplification:  Standard Unique Health Identifier for Health Care Providers, 69 Fed. Reg. 3434 (Jan. 23, 2004).

integrated finances, administration, and organization. *See* Centers for Medicare & Medicaid Services, Medicare State Operations Manual ("Operations Manual"), Chapter 2 §§ 2024, 2779F; 42 C.F.R. §§ 413.65(d)-(e).[4] A multi-campus hospital may submit only one cost report each year under its "principal provider" number. *See* Reimbursement Manual, Part 2, Chapter 1 § 112 ("Institutions which have multiple facilities but only one provider number * * * are required to submit one cost report under that principal provider number[.]").

Multi-campus hospitals often form as the result of a hospital merger or joint venture. After such a change, the relevant state agency and the Centers regional office ascertain whether the hospitals have the extensive legal, financial, organizational, and administrative integration that is required to be certified to operate as a single institution. *See* 42 C.F.R. § 413.65(d)–(e) (listing criteria to qualify as a single institution); Operations Manual, Chapter 2 § 2024 ("When two or more hospitals merge," the agency must decide "whether to continue to certify the hospitals separately or certify them as a single hospital (i.e., hospital with a main campus and an additional location)."). If any of the integration criteria is not met, the campuses are treated as "[f]ree-standing facilit[ies]," *see* 42 C.F.R. § 413.65(a)(2), and each must operate under its own Medicare provider number and submit, *inter alia*, its own cost reports, *see* Reimbursement Manual, Part 2, Chapter 1 § 112.

If certified as a single institution, the hospital must designate a "main campus," and that campus's Medicare provider number is adopted by the hospital for common use

---

[4] *Available at* http://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/som107c02.pdf (last visited Aug. 11, 2015).

by all of its facilities. *See generally* Operations Manual, Chapter 2 § 2779F. The provider numbers that correspond to the other campuses, if any, are retired. *See id*. § 2779F. Multi-campus hospitals also operate under a single provider agreement with Medicare, *id.*, through which they may bill for services provided to Medicare beneficiaries as long as they comply with all program requirements, 42 C.F.R. § 489.3. Multi-campus hospitals' subordinate campuses have "provider-based" status that entitles them to operate under the multi-campus hospital's number and agreement. *Id*. § 413.65(a)(2).

After collecting cost reports from each hospital or hospital group, the Secretary removes data that fails to meet set criteria for reasonableness, including data that is "incomplete[,] inaccurate * * *, or otherwise aberrant[.]" *Anna Jaques*, 583 F.3d at 3 (quoting Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2005 Rates ("Final 2005 Rules"), 69 Fed. Reg. 48,916, 49,049–49,050 (Aug. 11, 2004)). Because of the extensive amount of time required to verify, scrub, and process the data, the Secretary calculates each year's wage index using data from cost reports collected three years earlier. *See* Final 2005 Rules, 69 Fed. Reg. at 49,049.

In calculating a proposed wage index, the Secretary first determines the regional average hourly wage rate for hospitals in the defined geographic area, then calculates the national average hourly wage rate, and finally divides the former by the latter. *See* Final 2006 Rules, 70 Fed. Reg. at 47,373–47,374. The closer the wage index for an area is to 1.0, the closer that area's wage costs are to the national average.

The Secretary publishes the proposed wage indices and solicits comments from the public. 42 C.F.R. § 412.8. The

Secretary then promulgates the final wage indices as part of the Inpatient Prospective Payment System rules and policies for that year. 42 U.S.C. § 1395ww(d)(6). The index for each geographic area will be used for one year to adjust the wage portion of the prospective reimbursement payment for treatment provided in that area. *See Southeast Alabama Medical Center*, 572 F.3d at 915.

Of course, before any relevant wage data can be collected or indices calculated, the Secretary must assign Medicare hospitals to appropriate geographic regions. For the first two decades of the Prospective Payment System, the Secretary utilized the Office of Management and Budget's Metropolitan Statistical Areas to delineate the geographic areas for each wage index. *See* Prospective Payments for Medicare Inpatient Hospital Services, 48 Fed. Reg. 39,752, 39,766 (Sept. 1, 1983).

In December 2000, the Office of Management and Budget announced that it would adopt a new standard for demarcating metropolitan areas, known as Core-Based Statistical Areas. *See* Final 2005 Rules, 69 Fed. Reg. at 49,027 (citing Standards for Defining Metropolitan and Micropolitan Statistical Areas, 65 Fed. Reg. 82,228, 82,238 (Dec. 27, 2000)). After years of study, the Secretary determined that, beginning in fiscal year 2005, she would use those new Core-Based Statistical Areas to calculate the wage indices. Final 2005 Rules, 69 Fed. Reg. at 49,027. The Secretary recognized that this change would have considerable impact on hospitals. *Id.* at 49,026–49,034. To mitigate those effects, the Secretary implemented various transitional provisions that, among other things, allowed affected hospitals to be temporarily reimbursed on the basis of other areas' wage indices. *See id.*

The Secretary later learned that, in three instances, the new geographic lines ran through multi-campus hospital groups, leaving them straddling the borders of more than one Core-Based Statistical Area. Final 2006 Rules, 70 Fed. Reg. at 47,444; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2008 Rates ("Final 2008 Rules"), 72 Fed. Reg. 47,130, 47,318 (Aug. 22, 2007) (noting that only three hospitals were affected).

That posed a unique problem for the Secretary: Although Medicare deemed those multi-campus hospitals to be "merged facilities operat[ing] as a single institution," and thus applied their combined wage data to the *wage index* for the main provider's geographic area, *reimbursement* for Medicare services would be based on the wage index of the area in which the patient was discharged. *See* Final 2006 Rules, 70 Fed. Reg. at 47,444; 42 C.F.R. § 412.64(b)(5). That meant that services provided at certain campuses might be reimbursed at a lower rate than services provided at others within the same institution.

Normally, the Secretary can rectify such unfairness in the reimbursement process through reclassification, a process by which hospitals and hospital facilities can be certified to receive payments based on the wage index of a different geographic area when their cost reports reflect comparable wage costs and proximity to that area. *See* 42 C.F.R. § 412.230. Such reclassification was not an option for the campuses of multi-campus hospitals, however, because they submitted "a single cost report * * * [which did] not differentiate between merged facilities in a single wage index area or in multiple wage index areas." Final 2006 Rules, 70 Fed. Reg. at 47,444; *see also* Final 2008 Rules, 72 Fed. Reg. at 47,317 ("[T]he Medicare cost report, in its current form, does not enable [] multicampus hospital[s] to separately report

[their] costs by location" because they are "integrated institution[s] with one accounting structure.").

In response, the Secretary proposed that individual campuses manually report campus-specific wage data through a supplemental form. Final 2006 Rules, 70 Fed. Reg. at 47,444. That would allow the Secretary to determine whether that specific campus's wage costs better approximated those of its physical situs or of the main provider's reporting area. *Id.*

Although the Secretary was focused on the patient-reimbursement-rate problem, one commenter suggested that, if the Secretary obtained this supplemental campus-based data, she should also use it to calculate the average hourly wage of the geographic area in which a campus was located, rather than the geographic area of the main campus. Final 2006 Rules, 70 Fed. Reg. at 47,445 (Secretary should "modify [her] policy and include only salaries and hours of the workforce attributable to the campus or campuses in the area in order to calculate an area wage index."). Put simply, the commenter suggested that a wage index should be based on data solely from campuses within the geographic area, and not from campuses situated in another Core-Based Statistical Area.

After studying the issue and the public comments, however, the Secretary rejected the collection of such supplemental campus-based data at that time as infeasible. Final 2006 Rules, 70 Fed. Reg. at 47,445–47,446. Based on her analysis, she concluded that any benefit that would arise from requiring supplemental data—whether for calculating the wage index or for Medicare-reimbursement reclassification applications—had not yet been shown to justify the substantial administrative burden it would impose

on hospitals, fiscal intermediaries, and the Secretary. *Id.* As the Secretary explained, calculating the wage index based on the geography of individual campuses rather than that of main providers "presents certain logistical challenges that [she] would like to consider in the context of possible permanent cost report changes to accommodate the electronic reporting of separate wage data by individual campus," and she anticipated "having a full discussion of these issues as part of a future rulemaking." Final 2006 Rules, 70 Fed. Reg. at 47,446.

Many of the Secretary's concerns overlapped with the problems of requiring supplemental data generally. Multi-campus hospitals might not have readily available campus-specific information because of their complete financial and operational integration, as well as the fact that employees commonly worked at multiple campuses. *See* Final 2008 Rules, 72 Fed. Reg. at 47,318–47,319. Furthermore, whatever information could be collected would have to be audited, a process that normally takes three years—far too long to permit timely remediation of the problem for 2006 and 2007.

And even if reliable calculations could be timely made and timely audited, the Secretary determined that supplemental campus-based data would be of limited value. Because those groups that qualify as multi-campus hospitals, by definition, have integrated finances, the average hourly wage for each campus would be expected to approximate or be nearly identical to the average wage of the entire institution. Final 2006 Rules, 70 Fed. Reg. at 47,445.

The Secretary, in short, "reasonably believe[d] that the added precision" that might come from collecting the data on a campus-specific basis "would not justify the added

complication." *ParkView Medical Associates, LP v. Shalala*, 158 F.3d 146, 149 (D.C. Cir. 1998); *accord Atrium Medical Center v. Department of Health and Human Services*, 766 F.3d 560, 570 (6th Cir. 2014) ("[T]he Medicare Act allows the Secretary to sacrifice complete accuracy for 'administrative simplicity.'") (citation omitted); *Adventist GlenOaks Hospital v. Sebelius*, 663 F.3d 939, 945 (7th Cir. 2011); *see also* Final 2006 Rules, 70 Fed. Reg. at 47,446; Changes to the Hospital Inpatient Prospective Payment Systems and Fiscal Year 2007 Rates ("Final 2007 Rules"), 71 Fed. Reg. 47,870, 48,067 (Aug. 18, 2006).

The Secretary, however, encouraged additional input on how the issue should be handled going forward. Final 2006 Rules, 70 Fed. Reg. at 47,446. In August 2007, that continued study bore fruit, and the Secretary partially revised her view. Specifically, she concluded that "allocation of a multicampus hospital's wages and hours across different labor markets" could increase the precision of the wage index. Final 2008 Rules, 72 Fed. Reg. 47,130, 47,317. She accordingly proposed to change course in calculating the wage indices starting in fiscal year 2008. *Id.*

The Secretary, however, still considered the collection of campus-specific wage data from multi-campus hospitals to be logistically impracticable, so she sought an alternative means of reliably attributing wage costs to individual campuses. Final 2008 Rules, 72 Fed. Reg. at 47,317–47,318. The Secretary considered three potential proxies for wage data: (i) the number of beds in each campus, (ii) the number of discharged patients in each campus, or (iii) the number of full-time staff in each campus. *Id.*

Each approach had problems. Neither the number of beds nor the number of discharges bore any logical

correlation to wage costs. Final 2008 Rules, 72 Fed. Reg. at 47,317–47,318. And commenters explained that providing information about the full-time employees at each campus would be extremely burdensome because of the fully integrated structure of multi-campus hospitals. *Id.* In particular, one multi-campus hospital noted that "over half of the organization's employees have responsibilities at two and three of its campuses[,] * * * some types of employees * * * spend time at all three campuses[,] and nurses move from facility to facility depending on need." *Id.*

The least problematic approach, the Secretary determined, would be to use the number of full-time employees to allocate the hospital's wage-cost data to individual campuses. Final 2008 Rules, 72 Fed. Reg. at 47,319. If that information were not available due to difficulties in accurately assigning employees to campuses, Medicare discharge data would be used. *Id.* Once she had allocated cost report data by campus, the Secretary would use that data to calculate the average hourly wage for the geographic area in which the campus was located. *Id.* at 47,317–47,319.

**Factual and Procedural Background**

In 1996, three hospitals in southeastern Massachusetts—Tobey Hospital, St. Luke's Hospital, and Charlton Memorial Hospital—merged to form Southcoast Hospital Group. Southcoast chose Tobey Hospital as its main campus for Medicare purposes, and Southcoast operates as a unified hospital under a single Medicare provider agreement and provider number. From 1996 until 2005, all of Southcoast's campuses were in the Boston-Quincy geographic area. However, when the Secretary switched to Core-Based Statistical Areas in fiscal year 2005, Tobey Hospital remained

in the Boston-Quincy area, but St. Luke's and Charlton Memorial fell within the Providence area. Because Tobey Hospital is Southcoast's main campus and holds the Medicare provider number under which Southcoast operates, Southcoast continued to provide its multi-campus wage data in a single report, which the Secretary then applied to the wage index calculation for the Boston-Quincy area. When, in 2008, the Secretary switched to using Southcoast's Medicare discharge data to allocate the previously submitted and audited wage costs to individual campuses, the Boston-Quincy wage index increased by .0147. *See* Final 2008 Rule, 72 Fed. Reg. at 47318.

Forty-one other Medicare provider hospitals from Massachusetts, Rhode Island, and Vermont ("Providers"), which are located in or were reclassified into the Boston-Quincy area, filed a complaint with the Centers' Provider Reimbursement Review Board challenging the Secretary's inclusion of Southcoast's wage data in the wage index for fiscal years 2006 and 2007. The Board concluded that it did not have the authority to decide the validity of the Secretary's rules, and permitted the Providers to proceed directly to judicial review. 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. § 405.1842(f)(1)(ii).

The Providers then filed suit in the United States District Court for the District of Columbia. *See* 42 U.S.C. § 1395oo(f). They argued that the Secretary's inclusion of Southcoast's unified wage data in calculating the Boston-Quincy wage index for fiscal years 2006 and 2007 violated the statutory requirement that the wage index "reflect[] the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level," 42 U.S.C. § 1395ww(d)(3)(E)(i), and was arbitrary and capricious.

The district court granted summary judgment for the Secretary. *Anna Jaques Hospital v. Sebelius*, 33 F. Supp. 3d 47 (D.D.C. 2014). The court held that the statutory text, 42 U.S.C. § 1395ww(d)(3)(E)(i), "expressly leaves the wage index calculation to the agency," and that index "is not required to reflect the exact wage differences among geographic areas; it is only required to approximate those differences." 33 F. Supp. 3d at 54. The court further held that the Secretary reasonably determined that Southcoast was a single hospital, and reasonably continued to treat Southcoast as a single hospital in the Boston-Quincy area, where its main Medicare provider was located. *Id.* at 55–57.[5]

## II

### Analysis

We review the district court's grant of summary judgment *de novo*, applying the familiar standards of the Administrative Procedure Act, which require us to set aside an agency's decision only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2); *see also St. Luke's Hospital v. Thompson*, 355 F.3d 690, 693–694 (D.C. Cir. 2004).

We review the lawfulness of the Secretary's transitional method of calculating the wage index under the *Chevron* two-

---

[5] The district court's decision refers to the lead plaintiff in this case as "Anna Jaques Hospital," *see Anna Jaques Hospital v. Sebelius*, 33 F. Supp. 3d 47 (D.D.C. 2014), as did we in an earlier litigation, *Anna Jaques Hospital v. Sebelius*, 583 F.3d 1 (D.C. Cir. 2009). However, the original complaint and all of the parties' submissions to this court, including the notice of appeal, spell the name as "Anna Ja*c*ques Hospital." We will follow the Appellants' chosen spelling.

step framework, *Chevron, U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). *See also Anna Jaques*, 583 F.3d at 5; *Southeast Alabama Medical Center*, 572 F.3d at 916. When "Congress has directly spoken to the precise question at issue[,] * * * that is the end of the matter[.]" *Chevron*, 467 U.S. at 842–843. If the statute is "silent or ambiguous with respect to the specific issue," we will uphold the Secretary's interpretation if it is "based on a permissible construction of the statute." *Id.* at 843.

**Chevron *Step One***

It bears noting, at the outset, that the Providers do not challenge the Secretary's adoption of the Core-Based Statistical Areas. Nor do they dispute the propriety of the Secretary's decade-long treatment of Southcoast as a unified hospital with its wages from all three campuses submitted in a single, consolidated cost report within the Boston-Quincy area. The question at *Chevron* step one, then, is whether the Medicare Act forbade the Secretary, when calculating the Boston-Quincy wage index for 2006 and 2007, from continuing for a two-year transitional period to rely upon Southcoast's consolidated cost report, filed under the unified hospital's single, Boston-Quincy-area Medicare provider number.

We see nothing in the statutory text that mandated the selective deconsolidation of Southcoast's wage data while other Medicare reporting and operations remained consolidated under the main provider and Medicare reporting number. Quite the opposite, the statutory text expressly affords the Secretary flexibility and discretion in compiling data and calculating the wage index.

The text of the Medicare Act largely leaves the process of defining geographic boundaries and computing the wage

index to the Secretary's reasoned judgment. The Act requires the Secretary to adjust the standard prospective payment rate by "a factor (established by the Secretary)" that "reflect[s]" the relative wage level "in the geographic area of the hospital compared to the national average hospital wage level." 42 U.S.C. § 1395ww(d)(3)(E)(i). The statute provides some general guidance as to how the Secretary must calculate the wage "factor," by requiring that the wage index be updated at least annually "on the basis of a survey conducted by the Secretary (and updated as appropriate) of the wages and wage-related costs of [participating] hospitals in the United States." *Id.* In addition, any adjustment "shall be made in a manner that assures that the aggregate payments * * * are not greater or less than those that would have been made in the year without the adjustment." *Id.*

That is it. On all other aspects of the wage-index calculation, the statute is silent. It says nothing about the treatment of unified hospitals with multiple campuses working under a single Medicare provider agreement and number. Nor does the statute say how the geographic lines should be drawn or how to transition changes in those boundaries. "[T]he statute leaves considerable ambiguity as to the term 'geographic area,' which, based only on the literal language of the provision, could be as large as a several-state region or as small as a city block." *Bellevue Hospital Center v. Leavitt*, 443 F.3d 163, 175 (2d Cir. 2006). The statute "merely requires the Secretary to develop a mechanism to remove the effects of local wage differences"; it "does not specify how the Secretary should construct the index" and, in fact, "Congress through its silence delegated these decisions to the Secretary." *Methodist Hospital*, 38 F.3d at 1230. That is the antithesis of a *Chevron* step one statutory directive.

The Providers argue that the Secretary violated the text of the statute by creating a wage index for Boston-Quincy that "reflect[ed]" the wage level of hospitals from outside of the Boston-Quincy area. But that argument overlooks that, for purposes of the Medicare program, Southcoast is a single "hospital" with a single Medicare agreement and single Medicare provider number tied to Tobey Hospital, which sits squarely in the Boston-Quincy area.

Notably, the Medicare statute defines "hospital" as an "institution" that provides a number of medical services. 42 U.S.C. § 1395x(e). Other provisions of the statute, which refer to individual campuses of a hospital, make clear that a "hospital" can encompass institutions with multiple campuses and facilities. *See, e.g.*, 42 U.S.C. § 1395nn(h)(7)(B) (referring to "the facilities on the *main campus* of the hospital") (emphasis added); 42 U.S.C. § 1395nn(i)(3)(D) ("Any increase in the number of operating rooms * * * may only occur in facilities on the *main campus* of the applicable hospital.") (emphasis added); *see also Community Hospital of Chandler, Inc. v. Sullivan*, 963 F.2d 1206, 1212 (9th Cir. 1992). For statutory purposes, then, Southcoast with all of its campuses is one hospital situated in Wareham, Massachusetts (Tobey Hospital's location), which is within the Boston-Quincy area.

The Secretary's use of Southcoast's wages to calculate the Boston-Quincy wage index thus fully comported with the statutory requirement that the wage index reflect wage costs "in the geographic area of the hospital," 42 U.S.C. § 1395ww(d)(3)(E)(i). Beyond that, the question of how to deal with the fact that new boundaries placed campuses in a different geographic area than their main campus is precisely the type of interstitial question of implementation that the statute leaves in the Secretary's administrative hands. *See*

*Methodist Hospital*, 38 F.3d at 1230 (the statute "does not specify how the Secretary should construct the index * * * [so] Congress through its silence delegated these decisions to the Secretary"); *Bellevue*, 443 F.3d at 175; *cf. Adirondack Medical Center v. Burwell*, 782 F.3d 707, 710 (D.C. Cir. 2015) (rejecting challenge to "the precise methodology used by the Secretary" in calculating budget neutrality adjustments to reimbursement rates, noting "the wide discretion afforded the Secretary to implement the Medicare reimbursement formula"); *Zuni Pub. Sch. Dist. No. 89 v. Department of Educ.*, 550 U.S. 81, 90 (2007) (statutory "calculation method * * * is the kind of highly technical, specialized interstitial matter that Congress often does not decide itself, but delegates to specialized agencies to decide").

Requiring that the wage index "reflect[]" the wage rate in the relevant geographic area, 42 U.S.C. § 1395ww(d)(3)(E)(i), indicates that the Secretary is not required to calculate the wage index with scientific "exactitude," *Atrium Medical Center*, 766 F.3d at 569. We, in fact, have held that the Secretary can make "reasonable approximations" based on the "most reliable data available" at the time of publication. *Methodist Hospital*, 38 F.3d at 1230; *see also Atrium Medical Center*, 766 F.3d at 569 ("[T]he Secretary need only 'estimate[]' the proportion of labor costs and the resulting wage index need only 'reflect' the relative area wage levels.").

In sum, the Providers do not challenge the Secretary's decision to treat Southcoast as a single hospital for other Medicare purposes; they just want a carve-out for wage calculation. Nothing in the statute compels that.

**Chevron** *Step Two*

Even though the statute does not dictate the Providers' desired solution to Southcoast's wage data for 2006 and 2007, the Providers nevertheless contend that the Secretary's decision does not qualify for deference under *Chevron* step two at all because the decision to treat Southcoast as a single wage-reporting hospital is embodied in the Provider Reimbursement Manual, an informal guidance document. Providers' Br. 15. We disagree because the wage index was promulgated through notice-and-comment proceedings, and the treatment of Southcoast as a unified hospital for Medicare reporting is the product of published regulations.

Administrative interpretations of statutory provisions qualify for *Chevron* deference when "it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–227 (2001). Congress has expressly delegated to the Secretary the authority and discretion to create the wage index, 42 U.S.C. § 1395ww(d)(3)(E)(i), and the Providers do not argue otherwise.

In addition, the Secretary's calculation of the wage indices for 2006 and 2007 went through notice–and-comment rulemaking, a procedure ensuring the kind of deliberation that typically triggers *Chevron* deference. *See Mead*, 533 U.S. at 226. On top of that, Southcoast's status as a single hospital for Medicare reporting purposes—the administrative basis for the Secretary's decision to collect a single cost report—is also the product of numerous formal regulations. 42 C.F.R. § 413.65(d) (requiring integrated finances, administration, and operational control); *id.* § 413.65(e) (requiring common

ownership, supervision, and physical proximity). The Reimbursement Manual's explanation that single-reporting status under Medicare does not evaporate for cost reports simply clarifies a status already accorded by formal regulations. Therefore, we afford the Secretary's decision the same *Chevron* deference that we and other courts have repeatedly given her calculation of the wage index in the past. *See, e.g.*, *Atrium Medical Center*, 766 F.3d at 573 (noting the "exceptional breadth of Congress's delegation to the Secretary to establish and administer the wage index"); *Anna Jaques*, 583 F.3d at 5; *Southeast Alabama Medical Center*, 572 F.3d at 271; *Bellevue Hospital Center*, 443 F.3d at 175 (Secretary has the discretion to interpret the term "geographic area"); *Methodist Hospital*, 38 F.3d at 1230.

Looking through the lens of *Chevron* deference, the question is whether the Secretary acted reasonably in using Southcoast's unified wage data to calculate the hourly wage in the geographic area of its main campus and its administrative site for Medicare reporting purposes. *See Illinois Public Telecommunications Ass'n v. FCC*, 752 F.3d 1018, 1023 (D.C. Cir. 2014) ("[O]ne of the first principles of administrative law is that 'if the statute is silent or ambiguous with respect to the specific issue,' the only question for the court is whether the agency's interpretation of that statute is reasonable.") (citation omitted). In making that determination, the Secretary effectively made two decisions: (1) for 2006 to 2007, she was not yet prepared to calculate the wage index on the basis of campus-specific data, and given that, (2) she would treat Southcoast as if it were located "in" the geographic area of its main provider. Both of those actions fell within the range of reasonableness afforded the Secretary in calculating the wage index.

### (1) Campus-specific data

In first addressing how to handle the three multi-campus hospitals that were split by the transition to Core-Based Statistical Areas, the Secretary decided that, for 2006 and 2007, she would maintain the status quo of single-hospital reporting and not calculate the wage index based on campus-specific data. That judgment was reasonable.

To begin with, the Secretary reasonably concluded that the regulatory requirements of operating as a single hospital and the realities of employee fluidity between campuses ensured that the wages of each campus of a multi-campus hospital would be sufficiently similar to "reflect" the wage rate in the main provider's (and thus the entire institution's) geographic area. Final 2006 Rules, 70 Fed. Reg. at 47,445 ("[W]e believe there may not be a wide range of salaries for the same occupational categories within the same institution.").

That judgment was grounded in experience. Multi-campus hospitals have existed from "the beginning of the Medicare program" and have long been treated as single institutions with completely integrated organizational structure, finances, and administrative control. Medicare Program; Prospective Payment System for Hospital Outpatient Services, 63 Fed. Reg. 47,552, 47,587 (Sept. 8, 1998) ("[F]rom the beginning of the Medicare program, some providers, which are referred to in this section as 'main providers,' have owned and operated other facilities * * * that were administered financially and clinically by the main provider[,]" and "[i]n order to accommodate the financial integration of the two facilities without creating an administrative burden, we have permitted the subordinate facility to be considered provider-based."); *see also* Office of

Inspector General; Medicare Program; Prospective Payment System for Hospital Outpatient Services, 65 Fed. Reg. 18,434, 18,504 (April 7, 2000); Final 2006 Rules, 70 Fed. Reg. at 47,445–47,446; Final 2008 Rules, 72 Fed. Reg. at 47,318.

Moreover, to qualify for single-hospital status, the hospital group must meet a litany of integration requirements, such as ensuring that:

- the facility operates under the same license as the main provider;
- clinical services are integrated, as evidenced by:
  - o professional staff that have clinical privileges at the main provider;
  - o monitoring and oversight of the facility by the main provider;
  - o a reporting relationship between the medical director of the facility and the chief medical officer of the main provider;
  - o integrated medical records in a unified retrieval system (or cross reference) of the main provider; and
  - o integrated inpatient and outpatient services such that patients treated at the facility have full access to the services of the main provider;
- financial operations are fully integrated within the main provider's system, as evidenced by shared income and expenses between the main provider and facility, with all costs reported in the cost center of the main provider; and
- the facility is held out to the public and other payers as part of the main provider, and patients, upon entering the facility, are aware that they are entering the main provider and are billed accordingly.

42 C.F.R. § 413.65(d)(1)–(4).

For the facility that is not located on the campus of the main provider, as is the case with two of Southcoast's three campuses, additional requirements must be met:

- The facility must operate under the ownership and control of the main provider, as evidenced by:
    - o the main provider's 100% ownership of the business enterprise that constitutes the facility;
    - o a shared governing body with the main provider;
    - o the same organizational documents as the main provider; and
    - o the main provider's exercise of final responsibility for administrative decisions, final approval for contracts with outside parties, final approval and responsibility for personnel actions and policies, and final approval for medical staff appointments in the facility.
- The main provider must directly supervise the facilities in the same manner that it would monitor an existing department, as evidenced by:
    - o monitoring and oversight of the facility by the main provider, including a reporting and accountability relationship between the facility director and a manager at the main provider; and
    - o integrated administrative functions, including billing services, records, human resources, payroll, employee benefit package, salary structure, and purchasing services.

- The facility must be proximately located to the main provider.[6]

42 C.F.R. § 413.65(e)(1)-(3).

The Secretary reasonably determined that the effect of that extensive operational, organizational, and financial integration is that multi-campus hospitals tend to have similar wages across campuses. In addition, such multi-campus institutions commonly have employees—such as doctors, nurses, technicians, and administrators—that routinely migrate between campuses. Indeed, they are required by regulation to have privileges at each campus. 42 C.F.R. § 413.65(d)(2)(i). Accordingly, the Secretary reasonably concluded "that the average hourly wages for an individual campus and the whole hospital are similar because the two (or more) campuses are operating as a single entity under one Medicare provider number, are under common ownership and control, and are clinically and financially integrated." Final 2006 Rule, 70 Fed. Reg. at 47,445.

Furthermore, calculating the wage index on the basis of campus-specific data in 2006 and 2007, in the immediate wake of the geographical transition, would have imposed a substantial burden on the Secretary, fiscal intermediaries, and multi-campus hospitals. *See* Final 2006 Rules, 70 Fed. Reg. at 47,445. In fiscal years 2006 and 2007, the Secretary did not yet have separate wage data for individual campuses of multi-campus hospitals. *See id.* at 47,444 ("[B]ecause a

---

[6] To qualify as proximately located, the facility must be in the same State or an adjacent State as the main provider, 42 C.F.R. § 413.65(e)(3)(vii), and must either be within 35 miles of the main provider, 42 C.F.R. § 413.65(e)(3)(i), or meet other specified location requirements designed to ensure that the campuses serve the same patient populations, 42 C.F.R. § 413.65(e)(3)(ii)–(vi).

multicampus hospital is required to report data for the entire entity on a single cost report, there is no wage survey data for the individual hospital campus[.]"). Multi-campus hospitals have only ever submitted one cost report to the Secretary. Understandably so. The hospitals are required, by the Secretary's regulations, to integrate their finances, 42 C.F.R. § 413.65(d)(3), and therefore would not have separate cost data to report, Final 2006 Rules, 70 Fed. Reg. at 47,445–47,446.

Nor was that information readily obtainable in 2006 and 2007. The wage index is calculated based on cost reports from three years before the rule's promulgation. Final 2005 Rules, 69 Fed. Reg. at 49,049. To calculate the wage index for 2006 and 2007 on a campus-specific basis, the hospitals would have to have submitted three-year-old data, and the Secretary would have to have audited it in an extremely expedited manner before the wage index's promulgation—within one month for 2006 and one year for 2007. That was impracticable given that "the submission of manual [supplemental] cost report data would require a lengthy and tedious manual audit process for fiscal intermediaries[.]" Final 2006 Rules, 70 Fed. Reg. at 47,445. In addition, because multi-campus hospitals' staff members are required to have privileges across campuses, and indeed often work on multiple campuses, 42 C.F.R. § 413.65(d)(2)(i); Oral Arg. Tr. 54, requiring hospitals to go back in time to assign an individual employee's wage costs to a particular campus, rather than to the hospital as a whole, could have resulted in an artificial and unreliable measure of area wages. *See* Final 2008 Rules, 72 Fed. Reg. at 47,318.

Readjusting the data after the fact, as the Providers now seek, would have run into additional difficulties. The wage index must be a budget-neutral determination. *See* 42 U.S.C.

§ 1395ww(d)(3)(E)(i) (any adjustment made "shall be made in a manner that assures that the aggregate payments * * * are not greater or less than those that would have been made in the year without such adjustment"). But any retroactive payments could not be offset now, almost a decade after the fact, against other payments made in other areas to other providers without profoundly unsettling the system and the reliance interests of countless hospitals nationwide, a problem that counsel for the Providers acknowledged at oral argument. Oral Arg. Tr. 15. In addition, the Secretary's policy, upheld by this court, is that retroactive corrections to the wage index undermine the statutory purpose to base Medicare reimbursement rates on predetermined rates. *Methodist Hospital*, 38 F.3d at 1228–1229.

In other words, fully aware of the campuses' comprehensive integration and the obstacles it posed to collecting campus-specific wage data, the Secretary reasonably concluded that the tremendous burden of completely revamping the wage index calculation (and its application) would far outweigh any marginal impact it might have. That careful balancing of considerations reflects a fair and reasonable exercise of the Secretary's discretionary judgment in addressing this transitional issue.

Furthermore, the Secretary's decision simply maintained the wage-reporting status quo for a two-year transitional period while she continued to study the problem, sensibly concluding that "the interests in finality and administrative efficiency outweighed the value of increased accuracy." *Methodist Hospital*, 38 F.3d at 1235. We commonly "defer to the agency's judgment about how best to achieve a smooth transition[.]" *Sorenson Communications, Inc. v. FCC*, 765 F.3d 37, 52 (D.C. Cir. 2014); *see MCI Telecommunications Corp. v. FCC*, 750 F.2d 135, 141 (D.C. Cir. 1984)

("Substantial deference must be accorded an agency when it acts to maintain the status quo so that the objectives of a pending rulemaking proceeding will not be frustrated."). "While [the Secretary's] choice was not the only one permissible under the statute, the court has no occasion to second guess" the Secretary's judgment in that respect. *Methodist Hospital*, 38 F.3d at 1235.

The Providers present four objections that, in their view, establish that the Secretary's decision not to calculate the wage index on the basis of campus-specific data for the interim period of 2006–2007 was arbitrary and capricious. While they are thoughtfully presented, ultimately none succeeds.

*First*, the Providers contend that the Secretary provided "no rational explanation" for including wage data from outside the Boston-Quincy geographic area in calculating that area's wage index. Providers' Br. 19. That simply recycles the already-rejected argument that the Secretary improperly gave effect to Southcoast's recognized status as a unitary hospital for cost reporting, with an address in the Boston-Quincy area. While the Providers wish the Secretary had made a different choice, it was entirely rational to treat Southcoast as a single institution with respect to wage data, just as it is treated for numerous other Medicare purposes. *See* Final 2006 Rules, 70 Fed. Reg. at 47,446 ("[T]he use of the wage data for the entire multicampus hospital is consistent with [the Centers'] treatment of multicampus hospitals for calculating area wage index values, GME [Graduate Medical Education], DSH [Disproportionate Share Hospital], and provider-based purposes, under which multicampus hospitals operating under a single Medicare provider number are treated as a single hospital for payment purposes.").

Beyond that, the Secretary offered three quite reasonable explanations for her transitional treatment of multi-campus hospitals that straddled two Core-Based Statistical Areas. She discussed (i) the lack of available data from providers at that time on which to allocate wage data by campus, (ii) the practical and administrative obstacles to obtaining that data in a timely manner, and (iii) the stark imbalance between the logistical hurdles of collecting and using campus-specific data and the marginal anticipated impact of that data on the wage index calculation. Given those considerations, the Secretary's decision to treat Southcoast as in the same geographic area as its main provider's address, as the Secretary does for other Medicare purposes, falls within the range of reasonable judgment. *See Barnhart v. Thomas*, 540 U.S. 20, 29 (2003); *Adventist GlenOaks Hospital*, 663 F.3d at 945 (in calculating the wage index, Secretary may adopt "a bright-line rule that is comparatively easy to administer").

*Second*, the Providers argue that the Secretary's altered approach in 2008 shows that her decision in 2006 and 2007 was unreasonable. Providers' Br. 20. Not so. Courts have long recognized that "[a]n initial agency interpretation is not instantly carved in stone," and that, to engage in informed rulemaking, the agency may "consider varying interpretations and the wisdom of its policy on a continuing basis." *Chevron*, 467 U.S. at 863–864; *accord National Cable & Telecommunications Ass'n v. Brand X Internet Services*, 545 U.S. 967, 983 (2005). There can, after all, be more than one reasonable solution to a problem. The agency just must offer a reasoned explanation for changing course. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514 (2009); *Anna Jaques*, 583 F.3d at 6.

The Secretary provided that reasoned explanation here. Unlike in 2006 and 2007, when the consequences of the geographic reconfiguration first flared on the scene, by 2008, the Secretary had had three years to study the multi-campus hospital problem and to evaluate alternative ways of accurately and practicably collecting wage data. "Nothing prohibits federal agencies from moving in an incremental manner," *Fox Television*, 556 U.S. at 522, even when that includes revisiting prior judgments, *Brand X*, 545 U.S. at 1002.

Notably, even in 2008, the Secretary continued to have serious qualms about the campus-by-campus calculation methodologies suggested by commenters. The Secretary explained that the number of discharges was an "unstable data source to use in allocating a hospital's wages," and the number of beds "does not correlate well with how a hospital incurs its wage costs." Final 2008 Rules, 72 Fed. Reg. at 47,318. Furthermore, many multi-campus hospitals— including Southcoast—did not have full-time employment data for specific campuses because their employees often work at multiple campuses, rotating through them— sometimes on a daily basis—depending on need. *Id.*

The Secretary, in short, only altered her approach in 2008 because she became persuaded that "the benefit of having more accuracy in the wage index calculations should outweigh concerns over which alternative methods to use," Final 2008 Rules, 72 Fed. Reg. at 47,318–47,319, and *not* because she found the alternative wage-calculation methods to be obviously superior or her prior view to be unreasonable. Nothing in that decision evidences that her declination to leap immediately to that same conclusion in 2006 was arbitrary and capricious. Instead, both approaches were reasonable under their different circumstances.

*Third*, the Providers contend that the Secretary acted unreasonably because, while she used Southcoast's unified wage data to calculate the Boston-Quincy wage index, she paid Medicare reimbursements to Southcoast's New Bedford and Fall River campuses on the basis of the Providence wage index. Providers' Br. 19–20.

That may appear odd at first blush, but nothing in the Medicare Act requires that hospitals be treated the same for reimbursement and wage-index measurement purposes. For example, the statute "allow[s] a hospital to seek reclassification from its geographically-based wage area to a nearby wage area for payment purposes if it meets certain criteria." *Robert Wood Johnson Univ. Hosp. v. Thompson*, 297 F.3d 273, 276 (3d Cir. 2002); *see* 42 U.S.C. § 1395ww(d)(10); 42 C.F.R. § 412.230(a)(1)(ii).[7] Moreover, Medicare reimbursements to such reclassified hospitals are governed by an entirely different statutory provision, 42 U.S.C. § 1395ww(d)(8)(B)(i), than the creation of the wage index, 42 U.S.C. § 1395ww(d)(3)(E)(1). And the wage data of reclassified hospitals may or may not be included in their new area's wage index calculations, depending on the circumstances. *See* 42 U.S.C. § 1395ww(d)(8)(C)(i)(II) (requiring the Secretary to exclude reclassified hospitals' wage data from calculating the wage index under certain conditions); Final 2006 Rules, 70 Fed. Reg. at 47,378. In short, the statute does not categorically dictate that hospitals be reimbursed in accordance with a wage index that incorporates their own wage data, and, in some scenarios, even prescribes otherwise.

---

[7] Some of petitioners themselves have been reclassified into the Boston-Quincy area for patient reimbursement purposes. *See* Administrative Record at 100, *Anna Jaques Hospital v. Sebelius*, No. 1:13-cv-00053-ABJ (D.D.C. filed May 17, 2013), ECF No. 14.

It also bears noting that reimbursement for patient services on a campus-specific basis is significantly more administrable because it turns on the readily ascertainable location of the patient. Reconfiguring the wage index, by contrast, requires finding a reasonable way to unscramble an institution's merged financial and operational practices and to attribute centralized costs to individual campuses, even when employees routinely migrate between campuses.

*Fourth*, the Providers argue that, by not separating out campus-specific data, the Secretary failed to provide a uniformly measured wage index. Providers' Br. 20–23. As the Providers see it, the Secretary failed to apply geographic lines consistently across the Country. That is not correct. Uniformly and nationwide, the Secretary collected one cost report from each hospital participating in the Prospective Payment System, and used the wage data from that cost report to calculate the average hourly wage for the geographic area associated with the hospital's provider number. She utilized that rule consistently and evenhandedly for all hospitals, whether or not multi-campus.

At bottom, the Providers' central objection is that they believe there was a better method of calculating the wage index for their area. Maybe so. But all that the law requires, and all that we can evaluate on review, is whether the Secretary's approach was reasonable. *See American Forest and Paper Ass'n v. FERC*, 550 F.3d 1179, 1183 (D.C. Cir. 2008) ("Step two of *Chevron* does not require the best interpretation, only a reasonable one."). And that it was.

## (2) Geographic Designation of Southcoast

The Secretary also acted reasonably in recognizing Tobey Hospital, located in the Boston-Quincy area, as Southcoast's main campus for purposes of the Medicare program and, on

that basis, treating all of Southcoast's employees (or more accurately, their wage data) as located in that same geographic area. *See* Final 2006 Rules, 70 Fed. Reg. at 47,445–47,446. Tobey Hospital had performed that function within the Medicare program for nearly a decade, and Southcoast met all of the statutory and regulatory criteria for reporting in that manner, which the Providers do not dispute. Furthermore, Tobey Hospital provided the Medicare reporting number for the unified hospital, through which other Medicare reporting and all Medicare billings and certification took place.

In addition, the complications inherent in retroactively re-determining where a multi-campus hospital is located are identical to those the Secretary was attempting to avoid by declining to allocate the multi-campus hospitals' wage data by campus. The Providers' argument that "90%" or "the vast bulk of the multicampus hospital was located" in the Providence area proves that point. Reply Br. 6; Oral Arg. Tr. 48–49, 52–54. That "90%" number is based on the number of beds in Southcoast's campuses, which "does not correlate well with how a hospital incurs its wage costs." Final 2008 Rules, 72 Fed. Reg. at 47,318. Nor would Medicare discharges be a reliable basis on which to determine where the bulk of Southcoast's personnel and operations were located because the number "can fluctuate from year to year and may be an unstable data source." *Id.* at 47,317–47,318.

More importantly, the Secretary did not have the substitute data that the Providers prefer in 2006 or 2007. Final 2008 Rules, 72 Fed. Reg. at 47,318 ("Furthermore, neither of these numbers [the number of beds or discharges] is available on a campus-specific basis in Medicare's data systems."). Indeed, the Secretary's ultimate adjustment in 2008 had to rely on Southcoast's discharges because

Southcoast did not have reliable full-time and campus-specific employment data since its employees routinely worked on multiple campuses. *See id.* at 47,319. It thus was neither arbitrary nor capricious for the Secretary, when first confronting the problem in 2006, to eschew an approach that depended on unreliable data not in the Secretary's possession.

## III

## Conclusion

We hold that the Secretary's calculation of the wage index for fiscal years 2006 and 2007 was reasonable, non-arbitrary, and supported by substantial evidence. The judgment below is affirmed.

*So ordered.*