# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 25, 2019          Decided February 11, 2020

No. 18-5264

BAYSTATE FRANKLIN MEDICAL CENTER, ET AL.,
APPELLANTS

v.

ALEX MICHAEL AZAR, II, AS SECRETARY OF THE
DEPARTMENT OF HEALTH AND HUMAN SERVICES,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-00819)

———

*Rachel M. Wertheimer* argued the cause and filed the briefs for appellants.

*Edward Himmelfarb*, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief was *Alisa B. Klein*, Attorney.

Before: MILLETT and KATSAS, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

SENTELLE, *Senior Circuit Judge*: Appellants, Baystate Franklin Medical Center, Baystate Medical Center, Baystate Noble Hospital, and Baystate Wing Hospital (collectively, "Baystate"), brought suit against the Secretary of the Department of Health and Human Services ("HHS") related to his promulgation of a final rule calculating the wage index for hospital reimbursements in 2017. Baystate claimed that the final rule was unreasonable and arbitrary and capricious because the Secretary failed to comply with the statutory requirement to calculate a wage index that reflected the actual wage levels in Massachusetts, relied on data that he knew to be false, and entirely failed to consider an important aspect of the problem. Both parties moved for summary judgment. The district court held that the final rule reflected a permissible construction of the Medicare statute, and the decision was not arbitrary and capricious. Accordingly, the district court granted summary judgment in favor of the Secretary. Baystate filed the present appeal.

For the following reasons, we affirm the decision of the district court.

## I. BACKGROUND

### A. Statutory and Regulatory Background

Medicare is a federally funded health insurance program available to the elderly and individuals with disabilities. *See* 42 U.S.C. § 1395 *et seq.* Under the current Medicare program, the Secretary uses a Prospective Payment System ("PPS") to reimburse certain hospitals for treating Medicare beneficiaries. *See* Medicare Program; Hospital Inpatient Prospective

Payment Systems for Acute Care Hospitals and the Long-Term Care Hospital Prospective Payment System and Policy Changes and Fiscal Year 2017 Rates, 81 Fed. Reg. 56,762, 56,776 (Aug. 22, 2016) ("FY2017 PPS Final Rule"). The PPS requires the Secretary to reimburse hospitals at a "predetermined, specific rate[] for each hospital discharge," *id.*, rather than assessing the actual costs incurred by the provider for each patient, *see Anna Jacques Hosp. v. Burwell*, 797 F.3d 1155, 1158 (D.C. Cir. 2015).

The PPS payments are broken down into two components: a labor-related share and a nonlabor-related share. *See* FY2017 PPS Final Rule, 81 Fed. Reg. at 56,776. The statute requires the Secretary to adjust the labor-related share of the payments to account for geographic variations in hospital wage expenses. *See* 42 U.S.C. § 1395ww(d)(3)(E)(i); *see also Anna Jacques Hosp.*, 797 F.3d at 1158. To do so, the Secretary must calculate a "factor . . . reflecting the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level." 42 U.S.C. § 1395ww(d)(3)(E)(i). This factor is known as the "wage index," and it must be updated annually. *Anna Jacques Hosp.*, 797 F.3d at 1158.

For purposes of calculating the wage index, the geographic area of a hospital is determined by reference to the "Metropolitan Statistical Area[s]" defined by the Office of Management and Budget. 42 U.S.C. § 1395ww(d)(2)(D). Any hospital not within a Metropolitan Statistical Area is designated as in a "rural area." *Id.* The wage index for any given hospital in a state cannot be lower than the wage index applicable to the rural hospitals in that state. Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4410(a), 111 Stat. 251, 402 (42 U.S.C. § 1395ww note). This is referred to as the "rural floor."

The Centers for Medicare and Medicaid Services ("CMS") is the component of HHS that is responsible for calculating the wage index each year. To start the process, CMS requires hospitals to submit cost reports to Medicare administrative contractors ("MACs"). 42 C.F.R. § 413.20(b). The MACs and the hospitals then review and revise the data through an iterative process, which is outlined in a timetable published by CMS. App. at 49–53; *see also* Medicare Program; Hospital Inpatient Prospective Payment Systems for Acute Care Hospitals and the Long-Term Care Hospital Prospective Payment System and Proposed Policy Changes and Fiscal Year 2017 Rates, 81 Fed. Reg. 24,946, 25,073 (proposed Apr. 27, 2016) ("FY2017 PPS Proposed Rule") ("We created the processes previously described to resolve all substantive wage index data correction disputes before we finalize the wage and occupational mix data for the FY 2017 payment rates."). CMS uses this data to calculate an average hourly wage rate for every geographic area. *Anna Jacques Hosp.*, 797 F.3d at 1159. Then, it calculates the national average hourly wage rate and divides each geographic area's wage rate by the national average wage rate to determine each geographic area's wage index. *Id.*

By design, "each hospital's wage data affects the ultimate wage index for all hospitals in the area, and thus data errors or omissions by one hospital can [decrease] (or increase) PPS rates for other hospitals in its area." *Dignity Health v. Price*, 243 F. Supp. 3d 43, 46 (D.D.C. 2017). Similarly, because CMS must calculate a national average wage rate to develop the wage index, and because changes in the wage index must be budget neutral, 42 U.S.C. § 1395ww(d)(3)(E)(i), "a change in any single wage index can affect the reimbursement rate of each hospital in the country." *Methodist Hosp. of Sacramento v. Shalala*, 38 F.3d 1225, 1228 (D.C. Cir. 1994).

For the 2017 wage index, CMS released its preliminary wage data files on May 15, 2015. CMS expected to use the data in those files to develop the 2017 wage index. Hospitals were required to notify MACs of any "revisions to the wage index data as reflected in the preliminary files" by September 2, 2015. App. at 49. The wage index development process provided no opportunity for third-party hospitals to review or contest any other hospital's wage data. Following several rounds of review and revision between the hospitals and the MACs, the proposed rule was expected to be published for notice and comment in April or May 2016. The final rule was then expected to be published on August 1, 2016.

## B. Factual and Procedural History

The Baystate hospitals are located in Massachusetts. The only rural hospital in Massachusetts is Nantucket Cottage Hospital ("Nantucket"). Nantucket accordingly sets the rural floor for all hospitals in the state. The data that Nantucket submitted to CMS to calculate the 2017 wage index allegedly contained several errors that deflated Nantucket's hourly wage rate. On April 4, 2016, nearly seven months after the deadline to request revisions to the preliminary wage data had passed, Nantucket notified CMS by letter of the errors and sought to correct them. App. at 40–46. The hospital estimated that the corrections would "increase [its] average hourly wage from $43.78 to $60.50." App. at 45.

On April 27, 2016, the Secretary published the proposed 2017 wage index in the Federal Register before responding to Nantucket's letter. *See* FY2017 PPS Proposed Rule, 81 Fed. Reg. 24,946. The Secretary stated that "[i]f a hospital wished to request a change to its data as shown in May 15, 2015 wage data files and May 15, 2015 occupational mix data files, the hospital was to submit corrections along with complete,

detailed supporting documentation to its MAC by September 2, 2015." *Id.* at 25,072. The Secretary also emphasized that "[h]ospitals were notified of this deadline and of all other deadlines and requirements, including the requirement to review and verify their data as posted in the preliminary wage index data files." *Id.*

During the notice-and-comment period, many Massachusetts hospitals submitted comments to the Secretary urging him to accept Nantucket's corrected wage data because failure to do so would result in a major reduction in reimbursements for hospitals across the state. This precise problem is acute in Massachusetts because, unlike most states, Nantucket's wage index, which alone sets the rural floor in Massachusetts, is typically significantly higher than the wage index for other geographic areas in the state. *See, e.g.*, *Baystate Franklin Med. Ctr. v. Azar*, 319 F. Supp. 3d 514, 522 (D.D.C. 2018). For example, Baystate Health's public comment estimated that "the impact of the data errors alone is a loss of $115 million in Medicare inpatient and outpatient reimbursement to 39 Massachusetts hospitals in 2017." App. at 99. Conversely, other commenters suggested that if the Secretary modified the rule based on Nantucket's late filing, it "would establish a 'troubling' precedent by disregarding CMS rules and regulations, which provide ample opportunity to correct wage data through the agency's normal review process and deadlines." FY2017 PPS Final Rule, 81 Fed. Reg. at 56,920.

Ultimately, the Secretary enforced the deadline and refused to accept Nantucket's proposed revisions in calculating the final wage index. *Id.* The Secretary explained, "It is our intent to ensure that the wage index is calculated from the best available data, consistent with our wage index policies and development timeline." *Id.* He emphasized that the deadlines

"play[] an important role in maintaining the integrity and fairness of the wage index calculation." *Id.* He further noted that CMS has "consistently stated in annual [In-Patient] PPS rulemaking that hospitals that do not meet the procedural deadlines set forth in the [In-Patient] PPS rule will not be afforded a later opportunity to submit wage index data corrections or to dispute the MAC's decision with respect to requested changes." *Id.*; *see also* FY2017 PPS Proposed Rule, 81 Fed. Reg. at 25,073 (noting that a hospital cannot later seek "to revise another hospital's data that may be affecting the requesting hospital's wage index").

After exhausting the administrative appeals process, Baystate filed a complaint in the district court alleging that the wage index as calculated would cost Baystate approximately $19,907,000 in Medicare reimbursements. Baystate argued that relying on flawed data prevented CMS from calculating a wage index that actually reflected the wage level for Nantucket, contravening the Medicare statute and rendering the action arbitrary and capricious. Further, Baystate claimed that the final rule was also arbitrary and capricious because the Secretary failed to consider an important aspect of the problem: one hospital's erroneous data affected the wage index for every other hospital in the state, but those third-party hospitals had no opportunity to review or contest the flawed data until after the deadline to request revisions had already passed.

Both parties moved for summary judgment, which the district court granted in favor of the Secretary. The district court determined that the statute grants the Secretary "broad discretion" in administering the PPS program and held that "[t]he Secretary's decision to enforce longstanding PPS program deadlines and use Nantucket's uncorrected data was reasonable and based on a permissible reading of the Medicare statute." *Baystate Franklin Med. Ctr.*, 319 F. Supp. 3d at 521.

Additionally, the district court held that the Secretary's action was not arbitrary and capricious. Because Nantucket missed the relevant deadline to request revisions, the most reliable evidence available to the Secretary was the data that the MACs had already reviewed, not the revised data presented in April 2016. *See id.* at 523. Accordingly, the Secretary's decision to reject the requested revisions was reasonable. Further, the district court held that the Secretary sufficiently considered the effect of his decision on third-party hospitals. *Id.* Baystate objects to each of these conclusions on appeal.

## II. DISCUSSION

We review the district court's grant of summary judgment *de novo*. *Anna Jacques Hosp.*, 797 F.3d at 1163. First, we address Baystate's arguments that the Secretary failed to calculate a wage index that accurately reflected the wage level in Massachusetts and ignored an important aspect of the problem when he enforced the deadline against third-party hospitals, rendering his action arbitrary and capricious. Then we turn to Baystate's argument that the Secretary's interpretation of his authority to ignore the revised data contravened the Medicare statute's command to calculate a wage index that reflects the wage level in Massachusetts. Although Baystate does not cite *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), and argues almost entirely in terms of Administrative Procedure Act ("APA") review, the gist of its argument challenges the Secretary's interpretation of his authority under the Medicare statute, which, as discussed below, triggers a *Chevron* analysis. We hold that the Secretary's interpretation of his authority under the statute was lawful and his action was not arbitrary and capricious. Accordingly, we affirm the district court's grant of summary judgment.

## A. Arbitrary and Capricious Review

Under the familiar standards of the APA, we must "set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). We will uphold the agency's action if the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). An agency's action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it], or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Id.*

### i. *Secretary's Decision to Enforce the Deadline*

Baystate argues that the Secretary's decision to enforce the deadline and reject Nantucket's revised data was arbitrary and capricious because the Secretary relied on facts that he knew to be false when calculating the final wage index. However, instead of demonstrating that the Secretary's decision to reject the revised data was an unreasonable one, Baystate offers examples of different ways to structure the wage index development process to produce a more accurate wage index. *See* Appellants' Reply Br. at 9–10.

To start, it is difficult to divine exactly how the Secretary's decision to enforce a deadline that is established well in advance through rulemaking is arbitrary and capricious. More importantly, however, under the narrow standard of arbitrary and capricious review, the court accepts the Secretary's decision as long as he has provided a reasonable explanation. *State Farm Mut. Auto Ins. Co.*, 463 U.S. at 43. It would defy that standard of review to invalidate the Secretary's decision simply because there are alternate methods by which to calculate the wage index, even if those alternatives might ultimately produce a more accurate wage index.

In any event, the Secretary provided an entirely reasonable explanation for his decision to reject the revised data. As previously noted, the Secretary explained that CMS's intent is to calculate the wage index "from the best available data, consistent with [the] wage index policies and development timeline." FY2017 PPS Final Rule, 81 Fed. Reg. at 56,920. He emphasized that the deadlines are critical "in maintaining the integrity and fairness of the wage index calculation." *Id.* That was reasonable because the wage index must be computed on a nationwide basis that is budget neutral, so that an increase for hospitals in one area would necessitate a decrease in the wage index for other hospitals in other areas. *See Bellevue Hosp. Ctr. v. Leavitt*, 443 F.3d 163, 169 (2d Cir. 2006) ("These adjustments must be cost neutral, so that any increase in one hospital's wage factor must be offset by a decrease in another's."). He also pointed to prior statements that indicated "that hospitals that do not meet the procedural deadlines . . . will not be afforded a later opportunity to submit wage index data corrections." FY2017 PPS Final Rule, 81 Fed. Reg. at 56,920. Accordingly, the Secretary offered a reasonable explanation for his decision that is sufficient to survive arbitrary and capricious review.

Moreover, this is not a situation in which the Secretary previously granted relief from this deadline and is now changing his policy without a reasoned explanation. *See, e.g., Children's Hosp. Ass'n of Tex. v. Azar*, 933 F.3d 764, 773 (D.C. Cir. 2019) ("An 'unexplained inconsistency' with an earlier position renders a changed policy arbitrary and capricious." (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016))); *Centra Health, Inc. v. Shalala*, 102 F. Supp. 2d 654, 660 (W.D. Va. 2000) (finding that it was arbitrary and capricious for the Secretary to claim that excluding data was infeasible because the Secretary had excluded that same data in the past and had not "adequately explained" the difference in treatment.).

In fact, Baystate has not pointed to any examples in which the Secretary granted relief from a deadline in similar situations. At oral argument, Baystate's counsel pointed to the Secretary's inclusion of "improved data" from eleven hospitals in the final rule. FY2017 PPS Final Rule, 81 Fed. Reg. at 56,915. But that revision did not involve errors that a hospital discovered in its preliminary data after the deadline to request revisions had passed. Rather, those errors were identified during the review conducted by the MACs. *Id.* ("Since the development of the FY 2017 proposed wage index, as a result of further review by the MACs and the April and May appeals processes, we received improved data for 11 hospitals."). The 2017 wage index development timetable anticipated exactly that type of revision, unlike the revisions that Baystate now seeks. Additionally, Baystate's counsel suggested that the revisions in *Methodist Hospital of Sacramento v. Shalala*, 38 F.3d 1225 (D.C. Cir. 1994), were similar to the revisions sought in this case. Although *Methodist Hospital* did involve the PPS, the specific errors in that case "occurred prior to the creation of the PPS." *Id.* at 1228.

Nor has Baystate shown that the Secretary's decision was otherwise arbitrary and capricious. Baystate cites a concurring opinion in this Court to argue that "it would seem to be the very definition of arbitrary and capricious for HHS to knowingly use false facts when calculating hospital reimbursements." *St. Francis Med. Ctr. v. Azar*, 894 F.3d 290, 298 (D.C. Cir. 2018) (Kavanaugh, J., concurring). The majority in that case, however, did not address whether the Secretary's action was arbitrary and capricious. *See id.* at 297 (majority opinion). Moreover, that case involved the Secretary's refusal to consider challenges to statistics from 1981 that the Secretary was continuing to use for "*ongoing* calculations of reimbursements for *open* cost years." *Id.* at 298 (Kavanaugh, J., concurring). The concurrence suggested that it would have been reasonable for the Secretary to decline to "reopen closed cost years" given "the agency's interest in finality," but argued that the finality interests fell away for ongoing calculations. *Id.* The Secretary's decision to enforce his deadline here is akin to declining to reopen a closed cost year to consider new data. Baystate's reliance on the concurrence in *Saint Francis Medical Center* is thus misplaced.

For similar reasons, we disagree with Baystate's assertion that the Secretary ignored the "most reliable evidence available" in the first place. Appellants' Br. at 15. Because the Secretary retained discretion to set and enforce a deadline, the availability of evidence is measured from the date of the deadline, not the promulgation of the final rule. Nantucket did not present new evidence until seven months after the deadline had passed. In order to ensure the accuracy of this data, CMS would be required to return to the beginning of the wage index development process to vet the hospital's new data. Indeed, the Secretary never conceded that Nantucket's revised data was the most reliable data available, emphasizing that the information had not yet been vetted by CMS or its contractors.

Accordingly, the most reliable evidence available was the evidence that the Secretary used to calculate the final wage index, and the Secretary's decision was not arbitrary and capricious.

### ii. Secretary's Consideration of Important Aspects of the Problem

Baystate further contends that the Secretary's decision was arbitrary and capricious because he failed to consider an important aspect of the problem—namely, that other hospitals in Massachusetts had no opportunity to review or revise faulty data that adversely affected their wage indexes. Again, we disagree.

In summarizing the comments to the proposed rule, the Secretary noted that several commenters "believed it would be 'sound public policy' for CMS to use the most accurate data available in order to prevent one hospital's data errors from having a negative effect on Medicare payments of other hospitals." FY2017 PPS Final Rule, 81 Fed. Reg. at 56,920. He also highlighted that some commenters suggested that "the effects of not correcting the data error would be significant for hospitals in Massachusetts." *Id.* Those summaries reflect the Secretary's awareness that his decision to enforce the deadline necessarily affected all hospitals in Massachusetts. Even though he did not address the effects to Nantucket and third-party hospitals separately, the summary is sufficient to illustrate his consideration of that aspect of the problem. Therefore, we conclude that the decision to enforce the deadline against third-party hospitals was not arbitrary or capricious.

**B.** *Chevron* **Analysis**

As mentioned above, although Baystate does not cite *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), and frames its arguments in terms of APA review, *see* Appellants' Br. at ii ("The Secretary's decision to base the FY 2017 Wage Index on data he knew to be inaccurate was arbitrary and capricious."); Appellants' Reply Br. at i ("The Secretary's calculation of the FY 2017 Wage Index and application of the rural floor were arbitrary and capricious."), much of its argument focuses on the Secretary's statutory authority to enforce the deadline and reject the revised data under the Medicare statute.

Specifically, Baystate argues that "the Secretary ignored Congress's clear mandate to calculate a wage index that 'reflect[s] the relative hospital wage level in the geographic area of the hospital compared to the national average.'" Appellants' Br. at 15 (quoting 42 U.S.C. § 1395ww(d)(3)(E)(i)). Further, Baystate asserts that, "[w]hile the Secretary undoubtedly has discretion in developing the process for calculating the wage index, that discretion does not permit him to disregard the requirements of the Wage Index Statute." *Id.* at 18. Arguments related to an agency's interpretation of its authority to act under a statute are the principal concern of *Chevron*. *See Arent v. Shalala*, 70 F.3d 610, 615 (D.C. Cir. 1995). To be sure, "[w]e recognize that, in some respects, *Chevron* review and arbitrary and capricious review overlap at the margins." *Id.* But it is under *Chevron*, not the APA arbitrary and capricious standard, that a court considers "whether the agency's construction of the statute is faithful to its plain meaning, or, if the statute has no plain meaning, whether the agency's interpretation 'is based on a permissible construction of the statute.'" *Id.* (quoting *Chevron*, 467 U.S. at 843).

Under the *Chevron* two-step framework, we first consider "whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc.*, 467 U.S. at 842. If Congress's intent is clear, "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43. If "Congress has not directly addressed the precise question at issue," however, we proceed to step two and will uphold the Secretary's interpretation if it is "based on a permissible construction of the statute." *Id.* at 843.

The Medicare statute requires the Secretary to compute a wage index that "reflect[s] the relative hospital wage level in the geographic area of the hospital compared to the national average hospital wage level." 42 U.S.C. § 1395ww(d)(3)(E)(i). We have previously rejected constructions of the statute that would require the Secretary to calculate the wage index with "scientific exactitude." *Anna Jacques Hosp.*, 797 F.3d at 1165; *see Methodist Hosp.*, 38 F.3d at 1230 (allowing the Secretary to make "reasonable approximations" based on the "most reliable data available"). Those decisions emphasize that the Secretary may balance accuracy against "finality and administrative efficiency." *Methodist Hosp.*, 38 F.3d at 1235; *see also Anna Jacques Hosp.*, 797 F.3d at 1169.

Baystate contends that the wage index statute requires the Secretary to calculate a wage index that reflects the actual, relative wage levels around the country. Likewise, Baystate argues that the rural floor statute requires the Secretary "to give hospitals like the Appellants the benefit of a wage index reflective of the relative wage levels in the state's rural labor market." Appellants' Br. at 17. Baystate asserts that, because the Secretary relied on faulty data to calculate Nantucket's wage index, it necessarily did not reflect the actual wage level

in rural Massachusetts. Thus, Baystate argues, the Secretary's refusal to accept Nantucket's untimely request exceeded his authority under the Medicare statute, depriving the Massachusetts hospitals of the wage index to which they were statutorily entitled. Baystate concedes that the Secretary is entitled to great discretion in calculating the wage index, and we agree. Accordingly, we will uphold the agency's interpretation as long as it is a permissible construction of the statute.

In this case, the Secretary exercised his statutory discretion to enforce a deadline and reject new data submitted by a hospital seven months after the deadline to request revisions to that data passed. As noted previously, had the Secretary accepted the revised data to calculate the final wage index, he would have been required to return to the beginning of the wage index development process to ensure the accuracy of the hospital's data. Allowing the Secretary to enforce the deadline for revising data is thus consistent with our decisions permitting the Secretary to balance accuracy against finality and efficiency. To hold otherwise would effectively render the Secretary's deadline a nullity because he would be required to waive compliance with the deadline anytime a hospital submitted revised data, even well after the relevant deadline passed.

While we agree with Baystate that the Secretary's discretion must be bound by some outer limits, we conclude that, whatever those outer limits may be, the Secretary's interpretation of his authority to enforce a deadline in calculating the wage index falls squarely within them. Accordingly, we hold that the Secretary's interpretation was a permissible construction of the statute.

### III.    CONCLUSION

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of the Secretary.