# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 23-5076

September Term, 2023

FILED ON: JUNE 28, 2024

SAULT STE. MARIE TRIBE OF CHIPPEWA INDIANS,
APPELLANT

v.

DEBRA A. HAALAND, SECRETARY, UNITED STATES DEPARTMENT OF THE INTERIOR, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:18-cv-02035)

Before: WILKINS, RAO, and PAN, *Circuit Judges*.

## JUDGMENT

This case was considered on the record from the United States District Court for the District of Columbia and the briefs and arguments of the parties. The court has accorded the issues full consideration and determined that they do not warrant a published opinion. *See* D.C. Cir. R. 36(d). For the reasons stated below, it is:

**ORDERED** that the judgment of the district court, entered on March 6, 2023, is **AFFIRMED**.

\* \* \*

The Sault Ste. Marie Tribe of Chippewa Indians ("the Tribe") purchased a parcel of land near Detroit, Michigan. In 2014, the Tribe asked the Department of the Interior ("DOI") to take the land into trust under a provision of the Michigan Indian Land Claims Settlement Act ("the Michigan Act"), in order to advance the Tribe's ambition of operating a casino on the land. The DOI denied the Tribe's land-into-trust application because the land purchase did not meet certain statutory requirements. The Tribe filed suit, seeking review under the Administrative Procedure Act ("APA"). The district court initially granted summary judgment in favor of the Tribe, but we reversed and remanded. *See Sault Ste. Marie Tribe of Chippewa Indians v. Haaland* (*Sault I*), 25 F.4th 12, 16, 24 (D.C. Cir. 2022). On remand, the primary issue was whether the Tribe's land purchase could be considered an expenditure "for educational, social welfare, health, cultural, or

charitable purposes which benefit the members of the [Tribe]" — if so, the United States would be required to take the land into trust under Section 108(c) of the Michigan Act. The district court held that purchasing land to build a casino was not covered by the statute and granted summary judgment in favor of the DOI. The Tribe appealed. Because we agree with the DOI and the district court that the Tribe's intention to dedicate a small sliver of the proposed casino's hypothetical profit to promoting the welfare of tribal members is insufficient to make the land purchase a qualifying expenditure, we affirm the judgment of the district court.

## I.

## A.

The factual background and the procedural history of this case are set forth in our prior opinion. *See Sault I*, 25 F.4th at 15–17. Accordingly, we provide only an abbreviated overview of the relevant statutory scheme, and briefly summarize the facts relevant to the instant appeal.

Congress passed the Michigan Act in 1997 to remedy historic injustice resulting from unconscionable treaties between certain Indian tribes and the United States government. *See Sault I*, 25 F.4th at 15; Michigan Act, Pub. L. No. 105-143, 111 Stat. 2652 (1997). As relevant here, the statute addressed an 1836 Treaty under which the Tribe, and other related tribes, ceded much of their ancestral land in the Upper Peninsula of Michigan to the federal government. *See Sault I*, 25 F.4th at 15. More than a century later, in 1946, Congress created the Indian Claims Commission to settle land claims against the United States. *See* Act of Aug. 13, 1946, Pub. L. No. 79-726, 60 Stat. 1049, 1050. The Commission determined that "the [1836] Treaty was unconscionable and ordered the United States to pay these tribes more than $10 million." *Sault I*, 25 F.4th at 15. After several decades in which the tribes were unsuccessful in negotiating a way to divide the Commission's award amongst themselves, Congress passed the Michigan Act to "provide[] for the distribution of the [$10 million in] judgment funds among the tribes with separate sections of the statute governing each tribe's use of its judgment funds." *Id.*

Section 108 of the Michigan Act sets forth how the judgment funds for the Sault Tribe should be used and administered. It directs the Tribe's Board of Directors to "establish a trust fund . . . [to] be known as the 'Self-Sufficiency Fund'" to receive settlement funds distributed by the Michigan Act. Michigan Act § 108(a)(1). Moreover, Section 108(b) describes how the Tribe may use the Fund's principal, while Section 108(c) governs the Tribe's expenditure of the Fund's "interest and other investment income." *Id.* §§ 108(b), (c).

Specifically, Section 108(b) provides that Fund *principal* "shall be used exclusively for," among other things, "investments or expenditures which the board of directors determines . . . are reasonably related to . . . economic development beneficial to the tribe; or . . . are otherwise financially beneficial to the tribe and its members." Michigan Act § 108(b)(1). Section 108(c), on the other hand, authorizes the Board to spend Fund *interest* only for certain enumerated uses, including "for educational, social welfare, health, cultural, or charitable purposes which benefit" the Tribe's members. *Id.* § 108(c)(4). Another approved use is "for consolidation or enhancement of tribal lands." *Id.* § 108(c)(5). Lastly, Section 108(f) mandates that "[a]ny lands acquired using amounts from interest or other income of the Self-Sufficiency Fund shall be held in trust by the

2

Secretary [of the Interior] for the benefit of the tribe." *Id.* § 108(f). In other words, if the Tribe acquires land with the Fund's *interest* for one of the permissible uses under Section 108(c), the DOI is obligated to hold that land in trust; but the agency must independently "verify that the land was legitimately acquired with Fund interest for the limited uses detailed in Section 108(c)." *Sault I*, 25 F.4th at 18.

Land taken into trust by the Secretary of the Interior "might qualify" under the Indian Gaming Regulatory Act ("IGRA") for the operation of a casino. *See Sault I*, 25 F.4th at 18 & n.3 (explaining that "the government's trust decision implicates whether the Tribe can conduct gaming under IGRA"). IGRA, enacted in 1988, provides that Indian tribes in states that allow gaming may operate casinos on specific categories of "Indian lands." 25 U.S.C. § 2710(d)(1). IGRA generally prohibits most casino gaming activities on off-reservation lands taken into trust after October 17, 1988, except under specific exceptional circumstances. *See id.* §§ 2719(a)–(b); 25 C.F.R. pts. 291–92. One such exception allows gaming on "lands [that] are taken into trust as part of . . . a settlement of a land claim." 25 U.S.C. § 2719(b)(1)(B)(i).

Separately, IGRA provides that casinos may operate on trust lands only "in conformance with a Tribal-State compact entered into by the Indian tribe and the State" that is approved by the Secretary of the Interior. 25 U.S.C. §§ 2710(d)(1)(C), (d)(3)(B); *see* 25 C.F.R. pt. 293. The Sault Tribe's Tribal-State compact states that "[a]n application to take land in trust for gaming purposes pursuant to § 20 of IGRA (25 U.S.C. § 2719) shall not be submitted to the Secretary of the Interior in the absence of a prior written" revenue-sharing agreement with the other tribes. J.A. 446.

**B.**

The Sault Tribe is the largest Indian tribe east of the Mississippi River, with more than 40,000 members who descend from a group of Chippewa bands that historically occupied the Upper Peninsula of Michigan. *Sault I*, 25 F.4th at 15. In 2012, the Tribe took steps to purchase a parcel of land, known as the "Sibley Parcel," in the Lower Peninsula of Michigan, near Detroit. *See id.* at 16.[1] The Tribe's Board passed a Tribal Resolution stating that the Tribe would "seek to have those lands placed into mandatory trust pursuant to section[s] 108 (c) and (f) of the [Michigan] Act, and establish its legal right to construct and operate *a casino gaming enterprise* on those lands." J.A. 119 (emphasis added). The Resolution further stated that the Tribe would devote five percent of any income from the casino to tribal welfare: three percent would benefit tribal elders and two percent would create a college scholarship program. It also earmarked ten percent of the casino's income to be deposited in the Self-Sufficiency Fund as an addition to the principal of the Fund.

Pursuant to its Resolution, in June 2014, the Tribe submitted a "land-into-trust application" to the DOI, stating that it intended to use interest or other income from the Self-Sufficiency Fund, pursuant to the Michigan Act, to purchase the Sibley Parcel. The Tribe relied on two alternative justifications for using Trust interest to purchase the Sibley Parcel, claiming that the land would

---

[1] Along with the Sibley Parcel, the Tribe also sought to acquire land in Michigan's Lower Peninsula near Lansing. The district court, however, found that the Tribe's claims with respect to the Lansing Parcel were moot based on later developments. That parcel is not at issue on appeal.

be used (1) for the "consolidation or enhancement of tribal lands," under Section 108(c)(5) of the Michigan Act; and (2) "for educational, social welfare, health, cultural, or charitable purposes" benefitting Tribal members, under Section 108(c)(4). J.A. 477–80. The land-into-trust application stated that the "[t]he acquisition of the Parcel will provide a land base for the thousands of tribal members who live in [the area], will facilitate the delivery of services to those tribal members, will generate revenues necessary for the provision of social services, and will create hundreds of jobs for those members." *Id*. at 480. Over the course of the next three years, the DOI requested supplemental information from the Tribe regarding the land acquisition, and the Tribe responded by submitting additional arguments and affidavits.

In January 2017, the DOI made an interim determination that there was insufficient evidence that acquisition of the Sibley Parcel would satisfy Section 108(c)(4) or (5) of the Michigan Act. But the DOI stated that it would "keep the Applications open" to allow the Tribe to present more evidence about how its proposal satisfied the statute's requirements. J.A. 745. The Tribe submitted no additional evidence to support its land-into-trust application. Thereafter, in July 2017, the DOI sent a final decision letter to the Tribe denying the application. The letter incorporated the findings of the January 2017 interim determination and declined to revisit the DOI's rejection of the Tribe's claims. Specifically, it stated that "[t]he Tribe bears the burden of demonstrating that it has met [the Michigan Act's] requirements for mandatory land-into-trust acquisitions," and that the Tribe "made no such demonstration even after being offered the additional opportunity to do so [after] the [interim determination]." *Id*. at 752.

The Tribe filed suit in the district court, alleging violations of the APA. In March 2020, the district court granted summary judgment to the Tribe, holding that the DOI's rejection of the Tribe's land-into-trust application was contrary to law because (1) the Michigan Act imposes a mandatory duty to grant such an application when a Tribe purchases land with Fund interest; and (2) the acquisition of the Sibley Parcel qualified as an "enhancement of tribal lands" under Section 108(c)(5). *See Sault I*, 25 F.4th at 14. The district court expressly reserved the question whether the Tribe's land-into-trust application also satisfied Section 108(c)(4). We reversed, concluding that, under the plain meaning of the Michigan Act, the DOI has independent authority to verify that the Tribe's acquisition of land with Fund interest is "consistent with the limited uses for such interest in Section 108(c)." *Id.* We further held that the Tribe's purchase of the Sibley Parcel did not qualify as an "enhancement of tribal lands" because it did not "improve the quality or value of the Tribe's *existing* lands." *Id.* at 14–15 (emphasis added). Because the district court had not yet addressed the Tribe's alternative argument — that the land purchase qualified as an expenditure "for educational, social welfare, health, cultural, or charitable purposes" — we remanded for further proceedings.

On remand to the district court, the parties filed cross-motions for summary judgment on the Tribe's remaining claim that the purchase of the Sibley Parcel fulfilled an "educational, social welfare, health, cultural, or charitable purpose[]" that benefits the Tribe's members. This time, the district court granted summary judgment in the DOI's favor. *See Sault Ste. Marie Tribe of Chippewa Indians v. Haaland*, 659 F. Supp. 3d 33 (D.D.C. 2023). The court concluded that Section 108(c)(4)'s meaning is "clear" and that its statutory text does not encompass an expenditure "to purchase land to build a casino and devote a sliver of its income to social welfare." *See id.* at 42–48. Indeed, the court stated, the Tribe's interpretation "could sweep just about any

4

purchase into § 108(c)(4)'s ambit so long as a cent it generates eventually furthers education, health, culture, or charity." *Id.* at 45. The court further held that the DOI did not act arbitrarily and capriciously in rejecting the Tribe's arguments. *Id.* at 48. The Tribe filed a timely appeal. We have jurisdiction under 28 U.S.C. § 1291.

## II.

We review the district court's grant of summary judgment de novo under the APA. *Baystate Franklin Med. Ctr. v. Azar*, 950 F.3d 84, 88–89 (D.C. Cir. 2020). We set aside an agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency's action is contrary to law "[i]n the absence of statutory authorization for its act." *Hikvision USA, Inc. v. FCC*, 97 F.4th 938, 944 (D.C. Cir. 2024) (quoting *Atlantic City Elec. Co. v. FERC*, 295 F.3d 1, 8 (D.C. Cir. 2002)). And an agency's action is arbitrary and capricious if the agency has "entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before [it]." *Baystate*, 950 F.3d at 89 (second alteration in original) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). But the "scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Id.* (quoting *State Farm*, 463 U.S. at 43).

## III.

The Tribe takes issue with two aspects of the DOI's denial of its land-into-trust application. First, the Tribe argues that the DOI's interpretation of Section 108(c)(4) was contrary to law. According to the Tribe, its use of Fund interest to purchase land for a casino qualifies as an expenditure for "educational, social welfare, health, cultural, or charitable purposes" because the Tribe intends to use some of the casino's profits to enhance the well-being of Tribal members. Thus, the Tribe asserts, the DOI misinterpreted the statute by requiring a more direct relationship between the funds expended and the requisite purpose. Second, the Tribe contends that even under the DOI's reading of Section 108(c)(4), the agency "arbitrarily failed to address evidence that the Sibley purchase" directly served educational, social welfare, health, cultural, or charitable purposes. Sault Br. 48 (capitalization altered throughout). We reject both arguments in turn.

## A.

Section 108(c)(4) authorizes the Board of the Sault Tribe to spend Fund interest "for educational, social welfare, health, cultural, or charitable purposes which benefit" the Tribe's members. Michigan Act § 108(c)(4). The Tribe seeks to persuade us that acquiring land to operate a casino is an approved use under this subsection. According to the Tribe, its purchase of the Sibley Parcel was "designed to 'enable the Tribe to address the health, educational, welfare, and cultural needs of' tribal members in the Upper and Lower Peninsula, by 'generat[ing] revenues necessary for the provision of social services' through Indian gaming." Sault Br. 26 (alteration in original) (quoting J.A. 479–80). In other words, the Tribe argues that buying land to construct a casino is acceptable because the profits from the casino will help the Tribe accomplish "its objective, goal, or end" of meeting "the unmet social welfare, cultural, health, charitable, and educational needs of the Tribe." *Id.* at 26–27. We are unconvinced by the Tribe's argument

5

because its proposal to channel five percent of casino profits into approved uses is too attenuated and too uncertain to meet the requirements of Section 108(c)(4).

First, the connection between the expended Fund income and the Section 108(c)(4) purpose is remote. Specifically, the Tribe used Trust income to buy land, on which it seeks to build a casino, from which it hopes to make a profit, of which it intends to devote a small portion to qualifying purposes. Although the Tribe now represents that "all net gaming revenues will [] be dedicated to advancing tribal welfare," *see* Sault Br. 22, its initial Tribal Resolution allocated only five percent to the welfare of certain Tribe members, *see* J.A. 121. Thus, even if we assume that the casino will be built and will be profitable, the record supports only a small allotment of the hypothetical profits to promote "social welfare." And that falls far short of demonstrating an "educational, social welfare, health, cultural, or charitable *purpose*[]" for the funds expended to purchase land. We need not determine whether an investment by the Tribe in an economic venture that devoted all or substantially all of its profits to tribal welfare might qualify as an approved expenditure under Section 108(c)(4). The arrangement contemplated by the Tribe in this instance is plainly insufficient.

Second, the Tribe faces significant regulatory and legal uncertainty in its quest to build a casino on the Sibley Parcel, further weakening its claim that its plan for the land ultimately will fulfill an approved statutory purpose. IGRA generally prohibits tribes from conducting casino gaming activities on off-reservation lands, such as certain Indian lands held in trust (and placed in trust after October 17, 1988). *See* 25 U.S.C. § 2719(a). Such gaming may occur only under specified circumstances, including when "lands are taken into trust as part of . . . a settlement of a land claim." *Id.* § 2719(b)(1)(B)(i). Here, the applicability of that exception is unclear because the parties dispute whether the Michigan Act settled any land claims or merely distributed judgment funds. And in any event, the Tribe concedes that "satisfying the exception requires additional steps." Reply Br. 38.

Moreover, IGRA provides that tribes may operate casinos "in conformance with a Tribal-State compact entered into by the Indian tribe and the State." 25 U.S.C. §§ 2710(d)(1)(C), (d)(3)(B). In this instance, the Michigan compact requires the Tribe to have a written revenue-sharing agreement with other Michigan tribes before applying for gaming authorization under Section 20 of IGRA.[2] But the Tribe has not entered any such revenue-sharing agreement with other tribes pertaining to the proposed casino on the Sibley Parcel. Thus, it is far from certain that the DOI would approve the Tribe's application to operate a casino on the Sibley Parcel, even if the land were taken into trust. This uncertainty further weakens the Tribe's claim that its land acquisition ultimately will fulfill an approved statutory purpose. Indeed, if no casino is built, there will be no profit to spend on "educational, social welfare, health, cultural, or charitable purposes."

---

[2] The parties in this case debate whether the Michigan compact applies to the Tribe's land acquisition under the Michigan Act. Regardless of how that disagreement is resolved, the Sault Tribe's prospects for securing approval of its plan to run a casino on the Sibley Parcel are highly uncertain.

**B.**

The Tribe alternatively argues that the DOI arbitrarily and capriciously failed to consider evidence in the record that the Tribe acquired the Sibley Parcel to directly support "educational, social welfare, health, cultural, or charitable purposes." In particular, the Tribe asserts that it made the land purchase to "(1) secure a land base to provide social services to the Tribe's large, yet unserved, downstate population and (2) create jobs for thousands of nearby tribal members." Sault Br. 48–49. The Tribe points to facts from its land-into-trust application and an affidavit from its Tribal Registrar to support those claims. The land-into-trust application explained that the Sibley Parcel would provide "a geographic base to enable the Tribe to address the health, educational, welfare, and cultural needs of [its] members" in the Lower Peninsula, J.A. 479; while the affidavit averred that the Tribe "will never be able to provide meaningful employment opportunities or services to [a] substantial component of its population base without securing nearby trust land," *id.* at 555. According to the Tribe, the DOI "did not even acknowledge" the cited evidence when it rejected the Tribe's application, and instead focused on the "sole reason" that generating casino profits was too attenuated. Sault Br. 51.

We are unpersuaded by the Tribe's arguments for several reasons. First, the DOI did address the Tribe's claim that the purchase of the Sibley Parcel was to secure a land base for social services and to create jobs for nearby tribal members: The agency analyzed this claim under its consideration of the Tribe's Section 108(c)(5) arguments, finding that the Tribe failed to "provid[e] supporting documentation" for its proposition that "acquisition of the Parcels will generate revenue to allow for development of its existing land in the Lower Peninsula, which will 'provide employment and tribal services' to its members nearby." J.A. 752. It concluded that "the Tribe fails to cite any evidence" for this contention. *Id.* As the Tribe acknowledges on appeal, we can "[a]ssum[e]" that the DOI "intended these explanations to carry over to §108(c)(4)," Sault Br. 53, because the basic factual premise — that the Sault's land acquisition will serve as a land base to generate revenue and create jobs — applies equally to either subsection of Section 108(c).

Second, the DOI's rejection of the Tribe's arguments was reasonable: The Tribe's "evidence" consisted of conclusory statements about its intentions for the land and did not include any concrete plans to provide specific services to its members. Lastly, we note that the Tribe did not take advantage of multiple opportunities to provide additional evidence to support its land-into-trust application and to answer the DOI's questions about the land purchase. Most significantly, on January 19, 2017, when the DOI issued its interim determination denying the Tribe's application, the agency stated that it would "keep the Applications open" to allow the Tribe to present more evidence. J.A. 745. Yet the Tribe submitted no additional evidence after the interim determination.

\* \* \*

For the foregoing reasons, we affirm the judgment of the district court.

Pursuant to D.C. Circuit Rule 36, this disposition will not be published. The Clerk is directed to withhold issuance of the mandate until seven days after resolution of any timely petition for rehearing or petition for rehearing *en banc*. *See* Fed. R. App. P. 41(b); D.C. Cir. R. 41(a)(1).

7

**Per Curiam**

                                              **FOR THE COURT:**
                                              Mark J. Langer, Clerk

                  BY:    /s/
                                        Daniel J. Reidy
                                        Deputy Clerk