# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 30, 2021        Decided February 4, 2022

No. 20-5123

SAULT STE. MARIE TRIBE OF CHIPPEWA INDIANS,
APPELLEE

v.

DEBRA A. HAALAND, IN HER OFFICIAL CAPACITY AS
SECRETARY OF THE INTERIOR AND UNITED STATES
DEPARTMENT OF THE INTERIOR,
APPELLANTS

SAGINAW CHIPPEWA INDIAN TRIBE OF MICHIGAN, ET AL.,
APPELLEES

———

Consolidated with 20-5125, 20-5127, 20-5128

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:18-cv-02035)

———

*Erika B. Kranz*, Attorney, U.S. Department of Justice, argued the cause for federal appellants. With her on the briefs were *Jonathan D. Brightbill*, Principal Deputy Assistant

Attorney General, *Eric Grant*, Deputy Assistant Attorney General, and *John Smeltzer*, Attorney.

*Pratik A. Shah* argued the cause for non-federal appellants. With him on the briefs were *William A. Szotkowski*, *Leah K. Jurss*, and *Merrill C. Godfrey.*

*Michael A. Carvin*, *William D. Coglianese*, *Ian Heath Gershengorn*, and *Zachary C. Schauf* were on the briefs for appellants MGM Grand Detroit, LLC, et al.

*Danielle Spinelli* argued the cause for appellees. With her on the brief were *Kelly P. Dunbar* and *Kevin M. Lamb.*

*Samuel F. Daughety* was on the brief for *amici curiae* Professors Alexander T. Skibine, Richard B. Collins, and Robert J. Miller in support of appellees.

Before: HENDERSON and RAO, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* RAO.

Dissenting opinion filed by *Circuit Judge* HENDERSON.

RAO, *Circuit Judge*: This case involves a dispute about whether land acquired by the Sault Ste. Marie Tribe of Chippewa Indians ("Tribe") must be taken into trust by the Department of the Interior. The Tribe purchased the Sibley Parcel with interest from its Self-Sufficiency Fund and sought to have the land taken into trust with a view to establishing gaming operations. The Tribe claimed the Parcel was acquired for the "enhancement of tribal lands," one of the permitted uses of Fund interest specified in Section 108(c) of the Michigan Indian Land Claims Settlement Act ("Michigan Act"). Interior

concluded, however, that the mere acquisition of additional land was not an "enhancement" under the Michigan Act. Interior declined to take the Parcel into trust because the Tribe failed to demonstrate how the Parcel would improve or enhance tribal lands, particularly because the land was located in Michigan's Lower Peninsula far from the Tribe's existing lands in the Upper Peninsula.

The Tribe sued Interior. The district court granted summary judgment to the Tribe, holding that the Michigan Act imposed a mandatory duty on Interior to take the Parcel into trust, and therefore Interior lacked the authority to verify whether the Tribe's acquisition was a proper use of Fund interest under the Act. *Sault Ste. Marie Tribe of Chippewa Indians v. Bernhardt*, 442 F. Supp. 3d 53, 63 (D.D.C. 2020). The court further held that, even if Interior had such authority, it was unlawfully exercised because the acquisition of land "that increases the Tribe's total landholdings" was an "enhancement" of tribal lands. *Id.* at 73.

Under the plain meaning of the Michigan Act, we hold that before assuming a trust obligation, Interior has the authority to verify that the Tribe properly acquired the land with Fund interest, consistent with the limited uses for such interest in Section 108(c). Furthermore, in exercising that authority, Interior correctly determined that "enhancement of tribal lands" does not include an acquisition that merely increases the Tribe's landholdings. Rather, to enhance tribal lands, an acquisition must improve the quality or value of the Tribe's existing lands. We therefore reverse and remand for proceedings consistent with this opinion.

4

I.

A.

With more than 40,000 members, the Sault Ste. Marie Tribe of Chippewa Indians is the largest Indian tribe east of the Mississippi River. The Tribe descends from a group of Chippewa bands that historically occupied lands in the Upper Peninsula of Michigan. The Tribe, however, ceded much of its ancestral lands to the federal government through an 1836 treaty. *See* Treaty with the Ottawa and Chippewa, 7 Stat. 491 (Mar. 28, 1836).

More than a century later, Congress created the Indian Claims Commission and authorized it to hear, among other things, claims that treaties between Indian tribes and the United States were based on unconscionable consideration. Act of Aug. 13, 1946, ch. 959, § 2, 60 Stat. 1049, 1050. The Tribe brought such a claim, along with two other tribes party to the 1836 Treaty. The Commission held that the Treaty was unconscionable and ordered the United States to pay these tribes more than $10 million. *Bay Mills Indian Cmty. v. United States*, 26 Ind. Cl. Comm. 538, 542, 560 (1971) (finding the government paid only fifteen percent of the land's fair value under the Treaty). The United States did not distribute the judgment funds for several decades, in part because the three tribes could not reach an agreement on how to divide the money.

In 1997, the tribes and the federal government negotiated a compromise that resulted in the Michigan Act, Pub. L. No. 105-143, 111 Stat. 2652 (1997).[1] The Act provided for the

_____

[1] Following the Civil War, the government moved away from negotiating treaties with Indian tribes and instead enacted statutes to govern federal relations with tribes. *See* COHEN'S HANDBOOK OF

distribution of the judgment funds among the tribes with separate sections of the statute governing each tribe's use of its judgment funds. Michigan Act § 104.

Section 108 of the Michigan Act requires the Sault Ste. Marie Tribe to establish a "Self-Sufficiency Fund" to hold its share of the judgment. *Id.* § 108(a)(1). The Tribe's Board of Directors is named the trustee of the Fund and makes expenditure and distribution decisions, and "the Secretary [has] no trust responsibility for the investment, administration, or expenditure" of the Fund. *Id.* § 108(a)(2), (e)(2).

The Act also delineates distinct uses for Fund principal and interest. *Id.* § 108(b)–(c). As relevant here, Fund interest may be expended for only five uses: "an addition to the principal"; "a dividend to tribal members"; "a per capita payment to some group or category of tribal members"; "educational, social welfare, health, cultural, or charitable purposes which benefit the [Tribe's] members"; or "consolidation or enhancement of tribal lands." *Id.* § 108(c). If the Tribe acquires lands with Fund interest, those lands "shall be held in trust by the Secretary for the benefit of the tribe." *Id.* § 108(f).

B.

This dispute arises out of Interior's refusal to take into trust a parcel of land acquired by the Tribe.

---

FEDERAL INDIAN LAW § 1.03[9], at 69 (Nell Jessup Newton ed., 2012) [hereinafter COHEN'S HANDBOOK]. Statutes like the Michigan Act, which address only particular tribes, are special provisions not codified in the United States Code. *See generally* 25 U.S.C. ch. 19 codification note (explaining that provisions "relating to settlement of the land claims of certain Indian tribes [were] omitted from the Code as being of special and not general application").

Using Fund interest, the Tribe purchased 71 acres, known as the "Sibley Parcel," in the Lower Peninsula of Michigan. In its application to have Interior take the Parcel into trust, the Tribe acknowledged that it purchased the Parcel in anticipation of conducting gaming activities on the land. The Tribe contended that the Michigan Act gave Interior no authority to determine whether land acquired with Fund interest was for a use allowed by the Michigan Act, leaving that evaluation solely with the Tribe's Board. Because the Board had made the determination that the acquisition would "consolidat[e] or enhance[] … tribal lands" and used Fund interest, the Tribe maintained Interior had a mandatory duty to take the parcel into trust under Section 108(f). The Tribe also argued that the purchase constituted an "enhancement" of tribal lands because it "increas[ed] the total land possessed by the Tribe."

After some back and forth, Interior issued an interim decision concluding that before taking the land into trust it was required to verify both that the purchase of the Sibley Parcel complied with the Michigan Act's requirements for the use of Fund interest and that the Tribe had in fact used interest for the purchase. Relying on an earlier decision concerning the Bay Mills Indian Community, Interior maintained that "enhancement" means only acquisitions that "make greater, as in cost, value, attractiveness, etc.; heighten; intensify; [or] augment" existing tribal lands.[2] The Tribe had failed to provide

---

[2] Section 107 of the Michigan Act, which governs the judgment funds of the Bay Mills Indian Community, provides that Bay Mills may use interest generated from its share for "the consolidation and enhancement of tribal landholdings." Michigan Act § 107(a)(3). After Bay Mills acquired a parcel far away from its existing lands, Interior interpreted "enhancement" to mean an acquisition that "must somehow enhance (*i.e.*, make greater the value or attractiveness) some other tribal landholding already in existence." Although a district court disagreed with Interior's interpretation, the Sixth

sufficient evidence that the Sibley Parcel on the Lower Peninsula would constitute an "enhancement" of the Tribe's existing lands in the Upper Peninsula. Interior gave the Tribe an opportunity to submit further evidence by keeping its application open, but the Tribe did not do so. Interior issued a final decision denying the Tribe's application to take the land into trust, reiterating that the Tribe had failed to establish that the acquisition of this parcel would increase the value of existing tribal lands.

The Tribe filed a claim under the Administrative Procedure Act in the District Court for the District of Columbia, arguing that Interior's decision was contrary to law or arbitrary and capricious. Three casinos and two tribes intervened as defendants.

The district court granted summary judgment to the Tribe. *Sault Ste. Marie*, 442 F. Supp. 3d at 58. It first held that Interior had no authority to determine whether the Tribe's acquisition of the parcel complied with the uses of Fund interest set forth in Section 108(c) because Section 108(f) creates a mandatory duty for Interior to take into trust any land purchased with Fund interest. As an additional and independent ground, the court held that the Tribe's acquisition of the Sibley Parcel was an "enhancement of tribal lands" within the meaning of Section 108(c). The court rejected Interior's interpretation of "enhancement" as an acquisition that only increases the value of existing tribal lands. The court determined that "enhancement" unambiguously includes any acquisition that increases the total amount of tribal lands, even if a parcel does

Circuit vacated that decision because Bay Mills had sovereign immunity from the claims lodged in that case. *See Michigan v. Bay Mills Indian Cmty.*, 695 F.3d 406, 414–16 (6th Cir. 2012), *aff'd*, 572 U.S. 782 (2014).

not increase the quality or value of existing tribal lands. The court, however, declined to issue an order compelling Interior to take the Sibley Parcel into trust. Instead, the court vacated Interior's decision and remanded to the agency for further proceedings. Interior appealed.

We review the grant of summary judgment de novo "and therefore, in effect, review directly the decision of the agency." *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 883 (D.C. Cir. 2004) (cleaned up). The Tribe challenges Interior's interpretation of the Michigan Act. Therefore, "we first consider 'whether Congress has directly spoken to the precise question at issue'" by looking to the statutory text. *Baystate Franklin Med. Ctr. v. Azar*, 950 F.3d 84, 92 (D.C. Cir. 2020) (quoting *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984)). If the statute unambiguously resolves the question, that is the end of our inquiry. *Id.* The plain meaning of the Michigan Act resolves both of the questions on appeal.

## II.

The threshold question is whether Interior has the authority to verify that land purchased with Fund interest was for one of the uses listed in Section 108(c) before taking the land into trust. Interior's obligation to take the land into trust is established by Section 108(f), which provides in full: "Any lands acquired using amounts from interest or other income of the Self-Sufficiency Fund shall be held in trust by the Secretary for the benefit of the tribe." Michigan Act § 108(f). As the parties agree, this provision imposes a mandatory duty on the Secretary to take into trust land acquired using Fund interest. The Tribe asserts that the only condition the Secretary may consider is whether Fund interest was in fact used to acquire the lands. Interior maintains, however, that its trust obligation

also imposes a duty to determine whether the Tribe properly acquired the land using Fund interest, that is, for one of the uses specified by Section 108(c). We agree with Interior's interpretation. Interior's authority to take land into trust under Section 108(f) necessarily includes the authority to determine whether the lands have been lawfully acquired under Section 108(c), which specifies the exclusive uses for which the interest or income of the Self-Sufficiency Fund may be spent.

When a statute establishes a trust obligation of the United States to an Indian tribe, the government acts "not as a private trustee but pursuant to its sovereign interest in the execution of federal law." *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 165 (2011). The government's sovereign obligations under the Constitution require the Secretary to ensure the faithful execution of the laws. U.S. CONST. art. II, § 3 (President's obligation to "take Care that the Laws be faithfully executed"). When taking lands into trust, the Secretary must ensure the government's trust obligation is established in accordance with law.

The Michigan Act limits the Tribe's use of Fund interest, and these limitations circumscribe the land that must be taken into trust by the government. The Act restricts the expenditure of Fund interest to five uses: "an addition to the principal"; "a dividend to tribal members"; "a per capita payment to some group or category of tribal members"; "educational, social welfare, health, cultural, or charitable purposes which benefit the [Tribe's] members"; *or* "consolidation or enhancement of tribal lands." Michigan Act § 108(c). As the Tribe acknowledges, Section 108(c) lists permissible uses for Fund interest, which necessarily excludes other uses. Therefore, land acquired for a use not listed in Section 108(c) would not be properly acquired with Fund interest such that the Secretary must take it into trust under Section 108(f).

The limited uses for Fund interest contrast with the more expansive uses for Fund principal. The principal may be expended when the "[B]oard … determines" it is "reasonably related to" such general uses as "economic development beneficial to the [T]ribe" or the "development of tribal resources." *Id.* § 108(b)(1)(A). The principal also may be used for expenditures that "are otherwise financially beneficial to the [T]ribe and its members." *Id.* § 108(b)(1)(B). The appropriate expenditures of Fund principal are delineated in terms that arguably leave substantial discretion to the determinations of the Board about whether the expenditure is for a particular use. By contrast, the use of Fund interest in Section 108(c) makes no mention of the Board's determinations, but instead lists five specific uses for which Fund interest "shall be distributed," reinforcing that the Tribe may expend Fund interest exclusively for those uses.

Although both Fund principal and interest and may be used for the "consolidation or enhancement of tribal lands," *only* lands acquired using Fund interest must be taken into trust. *Compare Id.* § 108(f) (lands acquired with interest "shall be held in trust"), *with id.* § 108(b)(4) (lands acquired with principal "shall be held as Indian lands are held"). The Act constrains the Tribe's use of Fund interest to certain uses. To respect the statutory limits on its trust obligation, Interior must have the authority to verify that the land was legitimately acquired with Fund interest for the limited uses detailed in Section 108(c). *Cf. Heckman v. United States*, 224 U.S. 413, 437 (1912) (explaining with respect to limits on the right of alienation of tribal property that "the maintenance of the limitations which Congress has prescribed as a part of its plan of distribution is distinctly an interest of the United States").

The government's obligation to ensure a lawful trusteeship is particularly salient because the decision to take tribal land

into trust implicates an elaborate patchwork of statutory and regulatory provisions. For instance, the Tribe sought to have the Sibley Parcel held in trust so that it might build a casino and develop gaming "if lawfully permitted under [the Indian Gaming Regulatory Act ("IGRA")] and under the Tribe's tribal-state gaming compact with the State of Michigan."[3] As the Tribe recognizes, the government's trust decision implicates whether the Tribe can conduct gaming under IGRA. This highlights Interior's interrelated responsibilities for enforcing laws regarding tribal affairs.[4] Ensuring compliance with the Michigan Act and the limits it places on land taken into trust allows Interior to manage its legal obligations comprehensively and to avoid unnecessary conflicts.

We recognize that the Michigan Act confers broad independence on the Tribe to administer the Fund in accordance with statutory requirements, and that the Tribe's expenditures are not subject to the approval of the Secretary. Michigan Act § 108(e)(2). The Secretary's decision, however, does not void the Tribe's purchase of the lands; it simply means

---

[3] Land taken into trust under the Michigan Act might qualify for an exception to IGRA's prohibition on casinos on lands a tribe acquired after its enactment. *Compare* 25 U.S.C. § 2719(a) (prohibiting gaming on lands acquired after October 17, 1988), *with id.* § 2719(b)(1)(B)(i) (creating an exception for "lands [that] are taken into trust as part of … a settlement of a land claim"). We express no opinion on whether land acquired under the Michigan Act would trigger IGRA's exception.

[4] The Secretary of the Interior is also charged generally "with the supervision of public business relating to … Indians." 43 U.S.C. § 1457; *see also* 25 U.S.C. § 2 (tasking "[t]he Commissioner of Indian Affairs … under the direction of the Secretary of the Interior" with "the management of all Indian affairs and of *all* matters arising out of Indian relations") (emphasis added).

the land will not be taken into trust.[5] The Tribe's independence with respect to Fund expenditures does not eliminate the federal government's separate and independent trust obligations. *See Jicarilla*, 564 U.S. at 181 ("While one purpose of the Indian trust relationship is to benefit the tribes, the Government has its own independent interest in the implementation of federal Indian policy."). When undertaking a trust obligation on behalf of the federal government, the Secretary may confirm that the lands were properly acquired using Fund interest or income.

The common law of trusts reinforces that Section 108(f) does not require Interior to take land into trust that the Tribe acquired contrary to law. Because Section 108(f) imposes a trust responsibility on the government, background principles drawn from the common law of trusts may inform our interpretation. *See id.* at 177 (explaining we may "look[] to common-law principles to inform our interpretation of statutes" governing the government's trust relationship with an Indian tribe); *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 475 (2003) (looking to the common law to determine the United States' duties as trustee).

A bedrock principle of trusts is that "[a]n intended trust or trust provision is invalid if … it is contrary to public policy." RESTATEMENT (THIRD) OF TRUSTS § 29(c). If an invalid trust is

---

[5] While this decision may have substantial consequences for how the Tribe is able to use and develop the land for gaming purposes (a question on which we take no position), Interior's decision to decline the trust relationship does not override the Tribe's independent decision to acquire the land using Fund interest. Contrary to the suggestion of our dissenting colleague, Interior's verification that land was acquired for a statutory use before taking such land into trust does not "condition" the Tribe's use of Fund interest. *See* Dissenting Op. at 3–5.

created, "[a] trustee has a duty not to comply with a provision of the trust that the trustee knows or should know is invalid because the provision is unlawful or contrary to public policy." *Id.* § 72; *see also Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 428 (2014) ("[T]he duty of prudence, under [a statute] as under the common law of trusts, does not require a fiduciary to break the law.").

These principles support Interior's interpretation of the Michigan Act to allow the government to ensure it takes land into trust only when consistent with the public policy established by the Michigan Act. Nothing in the Act obliges the government to assume a trusteeship that would further a violation of the law. When taking land into trust for the Tribe, Interior may consider whether the Tribe spent Fund interest for one of the exclusive uses under Section 108(c) in order to ensure that the government's trust relationship is secured on lawful foundations.

The Tribe raises several arguments in support of its position that the *only* condition the Secretary may consider is whether Fund interest was in fact used to acquire the lands. According to the Tribe, Section 108(f) requires Interior to take any lands acquired with Fund interest into trust without regard to whether the Tribe's acquisition of those lands comports with one of the exclusive uses enumerated in Section 108(c).

First, the Tribe maintains that because Section 108(f) specifies one and only one condition for taking land into trust— that it be acquired with Fund interest—the Secretary lacks the authority to verify if the land was acquired for a use enumerated in Section 108(c). The Tribe attempts to rely on a negative implication, but such an implication should be drawn only "when circumstances support a sensible inference" that a term was deliberately excluded. *NLRB v. SW Gen., Inc.*, 137 S. Ct.

929, 940 (2017) (cleaned up). No such inference can be drawn here because acquiring land with Fund interest is not naturally associated with the government's obligation to act lawfully when assuming trust responsibilities. Moreover, the fact that Section 108(f) does not explicitly state that the land must be lawfully or permissibly acquired with Fund interest does not undermine the fundamental principle that the government must follow the law. *Cf. Staples v. United States*, 511 U.S. 600, 605–06 (1994) (explaining that statutory silence does not undermine a "firmly embedded" legal principle). A reminder to act lawfully need not be written into every statutory provision.[6] The Tribe focuses myopically on Section 108(f), but Interior must comply with all relevant laws, including the other requirements of the Michigan Act.

Second, the Tribe emphasizes that "[*a*]*ny* lands acquired using [Fund] interest … shall be held in trust" and argues that "any" conveys an expansive meaning. Michigan Act § 108(f) (emphasis added). We agree. But the expansiveness depends on what the word "any" modifies, which here is "lands acquired using [Fund] interest." *Cf. Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 220 (2008) (looking to what the word "any" modifies when considering a statute's meaning). The use of "any" in this context prohibits Interior from imposing additional limitations on what land may be taken into trust; however, it does not eliminate the requirement that Fund interest be spent only for one of the exclusive uses in Section 108(c). Nor does the term "[a]ny lands acquired" require

---

[6] The dissent would effectively read a limitation into Section 108(f), precluding the Secretary from ensuring the trust obligation is established consistent with the Michigan Act. Nothing in the Act, however, eliminates the Secretary's "sovereign interest in the execution of federal law." *Jicarilla*, 564 U.S. at 165.

Interior to defer to the Tribe when implementing the government's trust obligations.

Finally, the Tribe maintains that the Act negates Interior's authority to review its acquisition of land because "the approval of the Secretary for any payment or distribution from the principal or income of the Self-Sufficiency Fund shall not be required and the Secretary shall have no trust responsibility for the investment, administration, or expenditure of the principal or income of the Self-Sufficiency Fund." Michigan Act § 108(e)(2). Relatedly, the Tribe suggests that principles of tribal sovereignty counsel reading the Michigan Act as leaving the authority to determine whether a purchase complies with Section 108(c) to the Tribe.

We agree that Section 108(e) protects the Tribe's autonomy to decide how to spend Fund principal and interest consistent with the terms of the Act; however, no encroachment on that autonomy occurred here. The Tribe's Board decided to use Fund interest to purchase the Sibley Parcel, and it did so without Interior's approval or interference. Interior does not claim the authority to superintend the Tribe's expenditures, but Interior has an independent sovereign obligation to evaluate whether the lands were legitimately acquired using Fund interest before taking them into trust. By fulfilling the trust responsibilities under Section 108(f), the Secretary does not run afoul of either 108(e)(2), which prohibits the government's interference with the Tribe's spending decisions, or the Tribe's sovereignty. Nor does Interior's authority to verify that the Tribe's acquisition of land was for a statutory use of Fund interest transform the mandatory duty to hold lands in trust into a discretionary one. Interior has no discretion to refuse to hold lands acquired with Fund interest in trust so long as that acquisition comported with statutory requirements.

The Michigan Act imposes distinct responsibilities on the Tribe and on Interior. The Tribe maintains the authority to spend Fund interest for statutory uses, including for the acquisition of land, and the government may not oversee those decisions. If the Tribe acquires land with Fund interest, however, Interior must determine whether its mandatory trust obligation under Section 108(f) has been triggered. As part of the determination to hold lands in trust, Interior may evaluate whether the land was acquired for one of the exclusive uses of Fund interest in Section 108(c).[7]

## III.

Interior may assess whether the Tribe acquired land with Fund interest and for a permissible use; however, Interior's decision must comport with the Administrative Procedure Act. The Tribe applied to Interior to have it take the Sibley Parcel into trust. Interior refused on the ground that the purchase was not a "consolidation or enhancement of tribal lands." The Tribe argues that Interior's decision was based on an erroneous reading of the Michigan Act and thus is contrary to law. We hold that Interior's interpretation is consistent with the Act. The mere acquisition of additional land, without any demonstration that the acquisition improves the quality or value of existing tribal lands, does not constitute an "enhancement of tribal lands" within the plain meaning of Section 108(c).

The Tribe may spend Fund interest "for consolidation or enhancement of tribal lands." Michigan Act § 108(c)(5). Because these terms are not defined in the Michigan Act, we give them "their ordinary, contemporary, common meaning," *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (cleaned

---

[7] Because we find no ambiguity in the Michigan Act, we reach neither Interior's claim for *Chevron* deference nor the Tribe's argument that the Indian canon requires an interpretation in its favor.

up), as informed by the context of the "overall statutory scheme," *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016) (cleaned up).

"Enhancement" typically refers to a qualitative improvement, meaning "[t]o raise in degree, heighten, intensify (qualities, states, powers, etc.)." 5 OXFORD ENGLISH DICTIONARY 261 (2d ed. 1989); *see also* BRYAN A. GARNER, GARNER'S MODERN AMERICAN USAGE 300 (2d ed. 2003) (explaining that "enhance … should refer to a quality or condition"); *Enhanced*, BALLENTINE'S LAW DICTIONARY (3d ed. 1969) (defining "enhanced" as "[i]ncreased, especially in value"). Put simply, to enhance is "to make better." BRYAN A. GARNER, GARNER'S DICTIONARY OF LEGAL USAGE 317 (3d ed. 2011). To be sure, "enhance" is sometimes defined as "augmenting," which typically refers to a quantitative increase. *See Enhancement,* BLACK'S LAW DICTIONARY (7th ed. 1999) (defining "enhancement" as "[t]he act of augmenting"); *see also Augment*, 1 OXFORD ENGLISH DICTIONARY 784 (2d ed. 1989) ("[t]o make greater in size, number, amount, degree, etc."). But the most common definition is qualitative. This indicates, as a starting point, that to constitute an "enhancement of tribal lands," a purchase would have to make the tribal lands better and not just add to them.

The text and context of Section 108(c) confirm that the Michigan Act uses "enhancement" in the ordinary way— referring to qualitative improvements. The object of enhancement here is "tribal lands." The parties agree that "tribal lands" refers, in some manner, to the Tribe's real property.[8] In the context of real property, "enhancement" refers

_____

[8] The parties disagree about the precise definition of "tribal lands." The Tribe maintains it refers generally to "the Tribe's total landholdings." The intervenors suggest that "tribal lands" is a term of art that refers to lands subject to tribal jurisdiction. We need not

to a qualitative improvement, not a quantitative increase. *See* 5 OXFORD ENGLISH DICTIONARY 261 (2d ed. 1989) (defining "enhance" in the context of property as "[i]n more recent use, (of property, etc.) to increase in value or price").

In other statutes involving Indian lands, Congress has used "enhancement" to refer to qualitative improvements. For example, the National Indian Forest Resources Management Act addresses "the development, maintenance, and enhancement of Indian forest land in a perpetually productive state." Pub. L. No. 101-630, § 305(b), 104 Stat. 4532, 4535–36 (1990) (codified at 25 U.S.C. § 3104(b)(1)). Consistent with development and maintenance, "enhancement" also refers to qualitative improvements. And keeping "land in a perpetually productive state" would not naturally include acquiring additional land. Moreover, in statutes addressing real property, Congress frequently lists the "acquisition" and "enhancement" of property as separate terms, further bolstering the understanding that the acquisition of land alone is not equivalent to an enhancement.[9] In these varied contexts, all involving land, the plain meaning of enhancement is qualitative and distinct from the mere acquisition of additional land.

Furthermore, in statutes addressing tribal land specifically, Congress commonly uses "acquire" when granting general

---

determine the precise scope of "tribal lands" as used in the Michigan Act, however, as the different definitions advanced by the parties all refer to real property held by a tribe.

[9] *See, e.g.*, 16 U.S.C. § 1456-1(f)(4)(C) (referring to "[c]osts associated with land *acquisition*, land management planning, remediation, restoration, and *enhancement*") (emphases added); 10 U.S.C. § 2601(e) (providing that the Secretary of a military branch may accept some gifts "consisting of the provision, *acquisition*, *enhancement*, or construction of real or personal property") (emphases added).

authority for tribes to purchase land.[10] The Michigan Act does not provide the Tribe with general authority to use Fund interest to acquire land. Rather the Act specifies that interest may be used for the "consolidation or enhancement of tribal lands." Michigan Act § 108(c)(5). Reading "enhancement" to include any acquisition or increase in landholdings would eliminate the more specific use of Fund interest for the "consolidation or enhancement of tribal lands."

Finally, the term "consolidation" has a specialized meaning in the context of tribal lands that precludes interpreting "enhancement" to include mere acquisitions of land. To consolidate tribal lands means to join two parcels under tribal ownership or perhaps to combine the fractionated ownership interests in a parcel of tribal land.[11] The Tribe concedes that consolidation refers to the acquisition of land or land interests for these purposes. If we interpreted "enhancement" to include any land acquisition, it would swallow the more particular type of land acquisition for

---

[10] *See, e.g.*, Pueblo de San Ildefonso Claims Settlement Act of 2005, Pub. L. No. 109-286, § 6(b)(2), 120 Stat. 1218, 1221 (providing that the Pueblo may use settlement funds "to acquire the federally administered Settlement Area Land" or "at the option of the Pueblo, to acquire other land"); Fallon Paiute Shoshone Indian Tribes Water Rights Settlement Act of 1990, Pub. L. No. 101-618, § 103(F)(1), 104 Stat. 3289, 3291 ("The Tribes are authorized to acquire by purchase … [certain] lands or water rights, or interests therein[.]"); Seneca Nation Settlement Act of 1990, Pub. L. No. 101-503, § 8(c), 104 Stat. 1292, 1297 ("Land within its aboriginal area in the State or situated within or near proximity to former reservation land may be acquired by the Seneca Nation[.]").

[11] *See* COHEN'S HANDBOOK § 1.07, at 106. Consolidation seeks to remedy the highly fractionated ownership of tribal lands, which resulted from the government's failed allotment policy. *Babbitt v. Youpee*, 519 U.S. 234, 237–38 (1997).

"consolidation." We ordinarily avoid interpreting a statute in a manner that would render a word superfluous or ineffective. If we adopted the Tribe's reading of "enhancement" to include any acquisition of land that increases acreage, then "consolidation" would do no independent work in the statute.[12]

The Tribe's arguments to the contrary fail to comport with the plain meaning of the Michigan Act. The Tribe maintains that "enhancement" can refer to a quantitative increase by analogizing to the term "sentence enhancement" or "enhanced benefits." But upon closer inspection, these examples do not support the Tribe's interpretation. Although enhancing a criminal sentence increases the amount of time a person will serve, that enhancement lengthens an existing sentence but does not add a new sentence.[13] Similarly, an enhancement of benefits would increase existing benefits, but it would not refer to adding a new set of unrelated benefits. The Tribe's examples confirm that "enhancement" must have a nexus to some existing thing, whether real property, a criminal sentence, or welfare benefits. In this appeal, however, the Tribe has not explained how its acquisition connects, geographically or

---

[12] The Tribe suggests that "consolidation" is not superfluous under its interpretation because the Tribe might swap a larger piece of land for a smaller one in order to consolidate lands. For such hypothetical land swaps to inform Interior's trust obligation, however, they would have to involve Fund interest, which seems unlikely. Regardless, enhancement refers to qualitative improvements in the context of land.

[13] The meaning of enhancement in the sentencing context is unusual. Unlike the ordinary meaning of enhancement, which is to make better, the enhancement of a sentence means "to make harsher." BRYAN A. GARNER, GARNER's DICTIONARY OF LEGAL USAGE 317 (3d ed. 2011); BRYAN A. GARNER, GARNER's MODERN AMERICAN USAGE 300 (2d ed. 2003) ("[B]ecause *enhance* has long had positive connotations, it is a mistake to use it in reference to something bad.").

otherwise, to existing tribal lands. Instead, it has merely acquired a separate parcel of land.

Finally, the Tribe cannot take refuge in the drafting history of the Michigan Act or the broad purposes of the statute. The Tribe contends that Interior's suggested amendments to a different section of the Act demonstrate that Interior understood "consolidation and enhancement" to refer to acquisitions. But Interior's purported understanding does not translate into Congress' meaning and this bit of "drafting history is no more legitimate or reliable an indicator of the objective meaning of a statute than any other form of legislative history." *Hamdan v. Rumsfeld*, 548 U.S. 557, 668 (2006) (Scalia, J., dissenting). Congress may change language in drafts for any number of reasons, but the law is only what Congress enacts. *See* U.S. CONST. art. I, § 7. The Tribe also maintains that the purpose of the Michigan Act was to promote the Tribe's economic self-sufficiency, and that the Act should be read to "effectuate its purpose." Even if we could identify a single purpose of the Michigan Act, no statute pursues its purpose at all costs, because legislation invariably includes trade-offs between different interests. *Cf. Landgraf v. USI Film Prods.*, 511 U.S. 244, 286 (1994) (explaining that statutes reflect compromises and do not "pursue a single goal"). The Michigan Act reflects a negotiated agreement between the Tribe and the government regarding the settlement of various land claims, similar to treaties with sovereign tribes. Particularly in this context, we must decline to unravel a legislative deal through resort to imputed purposes.

In sum, Interior's interpretation comports with the plain meaning of the Michigan Act because an "enhancement of tribal lands" does not include an acquisition of lands with no connection to increasing the quality or value of existing tribal lands. We need not define "enhancement of tribal lands" for all

purposes, but we reject the Tribe's argument that "enhancement" necessarily includes *any* acquisition of land.

* * *

The Michigan Act requires the Secretary of the Interior to take into trust land acquired with Fund interest, but the Act does not require the Secretary to violate the law. Therefore, before taking land into trust, Interior has the authority to confirm that the Tribe properly acquired the land with Fund interest for a statutorily permissible use. The Tribe may use Fund interest for the enhancement of tribal lands, but that does not include an acquisition of land that merely increases the acreage of the Tribe's lands without improving the quality or value of existing tribal lands.

For the foregoing reasons, we reverse the district court's judgment and remand for proceedings consistent with this opinion.

*So ordered.*

KAREN LeCRAFT HENDERSON, *Circuit Judge*, dissenting: This case presents a straightforward exercise of statutory interpretation. Under the familiar *Chevron* doctrine, we first assess whether the Congress' intent in § 108(f) of the Michigan Indian Land Claims Settlement Act (MILCSA), Pub. L. No. 105-143, 111 Stat. 2652 (1997), is clear as to the limits of the Department of the Interior's (Interior) Secretary's (Secretary) review before she takes lands into trust for the Sault Ste. Marie Tribe of Chippewa Indians (Sault); only if there is ambiguity does our analysis go further. *Eagle Pharms., Inc. v. Azar*, 952 F.3d 323, 330 (D.C. Cir. 2020); *see Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Because MILCSA unambiguously limits the Secretary's review to whether lands were "acquired using amounts from interest or other income of the Self-Sufficiency Fund," MILCSA § 108(f), our analysis should begin and end with the statute's plain text. Accordingly, I would affirm the judgment of the district court.[1]

We begin with the text, "the most traditional tool" of statutory interpretation. *Eagle Pharms.*, 952 F.3d at 330 (alteration adopted) (quoting *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1088 (D.C. Cir. 1996)). "Indeed, 'the preeminent canon of statutory interpretation requires us to presume that the legislature says in a statute what it means and means in a statute what it says there.'" *Id.* (alterations adopted) (quoting *Janko v. Gates*, 741 F.3d 136, 139–40 (D.C. Cir. 2014)). "[W]e 'cannot ignore the text by assuming that if the statute seems odd to us it could be the product only of oversight, imprecision, or

---

[1] Because I would hold § 108(f) unambiguously limits the Secretary's review before taking lands into trust to whether such lands were acquired using Fund income or interest, I would affirm the district court on that basis and end our analysis there, declining to conduct additional review of whether the Secretary applied the correct understanding of MILCSA § 108(c)(5) when she conducted her unauthorized review of the Sault's land purchase for compliance with § 108(c)(5).

drafting error.'" *Id.* at 333 (alteration adopted) (quoting *Engine Mfrs. Ass'n*, 88 F.3d at 1088–89). We also look to the statute's structure and must interpret it as part of a cohesive regulatory scheme, if possible, "but 'reliance on context and structure in statutory interpretation is a subtle business, calling for great wariness lest what professes to be mere rendering becomes creation and attempted interpretation of legislation becomes legislation itself.'" *Id.* at 332 (alteration adopted) (quoting *King v. Burwell*, 576 U.S. 473, 497–98 (2015)). Extrinsic materials "have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms." *Id.* at 338 (quoting *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005)).

Section 108(f) states: "Any lands acquired using amounts from interest or other income of the Self–Sufficiency Fund shall be held in trust by the Secretary for the benefit of the tribe." MILCSA, § 108(f). The district court concluded that § 108(f) unambiguously limits the Secretary's review to whether the Sault acquired the land using Self-Sufficiency Fund (Fund) interest or income. *Sault Ste. Marie Tribe of Chippewa Indians v. Bernhardt*, 442 F. Supp. 3d 53, 63–73 (D.D.C. 2020). I agree: § 108(f) is unambiguous. Under § 108(f)'s plain text, the Secretary "shall"—mandatorily—hold in trust any lands "acquired using amounts from interest or other income" of the Fund. MILCSA, § 108(f). There is no second condition. The Secretary's review is limited to whether the land at issue was "acquired using amounts from interest or other income" of the Fund. *Id.* The Congress has included language suggesting additional conditions in similar statutes but did not do so here. *See, e.g.*, The Gila Bend Indian Reservation Lands Replacement Act, Pub. L. No. 99-503, 100 Stat. 1798 (1986) ("The Secretary, at the request of the Tribe, shall hold in trust for the benefit of the Tribe any land which

3

the Tribe acquires pursuant to subsection (c) which meets the requirements of this subsection."). Although § 108(f) does not explicitly deprive the Secretary of authority to review the Sault's compliance with § 108(c), it only explicitly authorizes the Secretary to review whether the land was purchased with Fund income or interest and directs the Secretary to take land so purchased into trust.

The plain meaning of § 108(f) is further supported by § 108(e)(2), which provides: "Notwithstanding any other provision of law . . . the approval of the Secretary for any payment or distribution from the principal or income of the Self–Sufficiency Fund shall not be required and the Secretary shall have no trust responsibility for the investment, administration, or expenditure of the principal or income of the Self–Sufficiency Fund." MILCSA, § 108(e)(2). Granted, spending Fund income or interest differs from approving a trust application under § 108(f) but § 108(e)(2) makes clear that the Secretary has no role in approving any payment or distribution from the income or interest of the Fund and that the Secretary has no trust responsibility regarding expenditures. Nothing in these provisions authorizes the Secretary to review the Sault's land purchase for compliance with § 108(c) before she takes the land into trust. Under § 108(e)(2) the Secretary has no discretion to approve the Sault's use of Fund income to buy land under § 108(c). Therefore, if the Sault use Fund income to acquire land within its understanding of § 108(c), that land has been acquired using Fund income and the Secretary cannot review the acquisition beyond ensuring it expended Fund income. The land was unquestionably acquired using Fund income and, accordingly, "shall be held in trust by the Secretary." MILCSA, § 108(f). Under this statutory scheme, allowing the Secretary to review the Sault's land purchase would allow the Secretary to effectively—and without authority—condition that purchase. Considered together with

§ 108(f)'s clear limitation of the Secretary's review to whether the land was acquired using Fund income or interest, I believe the Congress did not grant the Secretary authority to independently review the Sault's compliance with § 108(c) before taking the acquired land into trust.[2]

The structure of the remainder of § 108 also supports this reading. The Sault Board of Directors (Board)—its governing body—is made the trustee of the Fund and entrusted with the spending decisions under MILCSA § 108(a). MILCSA, § 108(a). Sections 108(b) and 108(c) direct the Board's use of Fund principal (§ 108(b)) and income and interest (§ 108(c)). *Id.* §§ 108(b)–(c). Section 108(d) requires that an annual audit of the Fund be conducted by an independent accountant, which audit is to be made available to any Sault member; § 108(e) requires the Secretary to transfer the judgment funds[3] to the

---

[2] *Sac and Fox Nation of Missouri v. Norton*, 240 F.3d 1250, 1261–62 (10th Cir. 2001) supports this understanding of § 108(e)(2) and § 108(f). In that case, the Secretary adopted the same position as the beneficiary tribe (the Wyandotte Tribe of Oklahoma) that she did not have discretion to review whether the acquisition satisfied other more general fee-to-trust regulations. Addressing an analogous statute with a dollar amount limitation, the Tenth Circuit found that the "notwithstanding" language in a similar law enacted for the benefit of a Native American tribe unambiguously manifests that the Secretary does not have discretion to decide whether to take into trust land purchased by the tribe, as long as the land was purchased using the specified funds. *Sac and Fox Nation*, 240 F.3d at 1261–62.

[3] To compensate the Sault and other tribes for land the United States government purchased for an "unconscionably low sum," *Sault Ste. Marie Tribe*, 442 F. Supp. 3d at 74, the congressionally-established Indian Claims Commission awarded the Sault and other tribes more than $10 million in damages; MILCSA dictates how these "judgment funds" are to be distributed among the beneficiary tribes, including the Sault, *id.* at 58–59.

Fund and makes clear she has no approval power regarding payment or distribution; § 108(f), like § 108(e), directs the Secretary to act under specified circumstances. *Id.* §§ 108(d)–(f). None of these provisions suggests that § 108(c)'s spending instructions were intended to authorize the Secretary to review the Sault's use of Fund income before taking acquired land into trust.

Granted, § 108(b), which governs the use of Fund principal, provides that "[t]he principal of the Self–Sufficiency Fund shall be used exclusively for investments or expenditures which the board of directors determines" will achieve specified purposes. *Id.* § 108(b)(1). And § 108(c) does not contain similar language providing that the distribution of interest or income is to be determined by the Board. *Id.* § 108(c). Nonetheless, this difference between § 108(b) and § 108(c) does not render the Secretary's role under § 108(f) ambiguous. Section 108(a) gives the Sault Board control of the Fund's spending and § 108(b) and § 108(c) provide the Board guidance in spending the Fund's principal and income and interest. Neither § 108(b) nor § 108(c) indicates that the Secretary is to have any say over the Sault's use of the Fund and § 108(e)(2) makes this unmistakably clear. Interior conceded in district court that the Secretary does not have authority to review any expenditures of income under § 108(c)(1)–(3) notwithstanding those provisions do not include § 108(b)'s "board of directors determines" language. *Sault Ste. Marie Tribe*, 442 F. Supp. 3d at 64, 69. The inclusion or exclusion of that language alone cannot be read to mean that the Secretary has the power to review the Sault's decision or override § 108(f)'s plain text. If § 108(c)(1)–(3) guide the

Sault's expenditures without the Secretary's oversight, so too does the rest of § 108(c).[4]

My colleagues are convinced that general trust principles provide a background against which § 108(f) operates and therefore, even if the statute does not explicitly allow for the Secretary's review, taking land into trust is an exercise of sovereign governmental authority and the Sault's reading of § 108(f) would force the Secretary to take land into trust even if that land was acquired contrary to law. Because there is no "evidence that Congress meant something other than what it literally said" in § 108(f), I cannot join my colleagues and depart from the text's plain meaning. *Eagle Pharms.*, 952 F.3d at 332–33 (internal quotations omitted). MILCSA unambiguously gives the Sault the ability to use the Self-Sufficiency Fund's income and interest as it sees fit, consistent with its understanding of § 108(c). MILCSA does not authorize the Secretary to assess independently the Sault's use of Fund income or interest under § 108(c). As the district court correctly explained, notwithstanding the Secretary has a general trust obligation to administer the trust in compliance with the law, "MILCSA gives the Tribe, but not the Secretary, authority to determine compliance with § 108(c)—that is the law. Thus, the Secretary violates no fiduciary obligation by following the letter of § 108(f)." *Sault Ste. Marie Tribe*, 442 F. Supp. 3d at 71 (emphasis omitted). For these reasons, I would conclude § 108(f) is unambiguous and affirm the district court's decision on that basis.

---

[4] It may be possible for a tribal director to be sued for injunctive relief even if the Sault itself is insulated by sovereign immunity so that tribal members themselves would potentially oversee the Sault's expenditures under § 108(c). *See Sault Ste. Marie Tribe*, 442 F. Supp. 3d at 68 n.10.

Even if consideration of general trust principles supported the conclusion that § 108(f) is ambiguous regarding the Secretary's ability to review the Sault's compliance with § 108(c) before taking land into trust—because it does not *unambiguously* allow the Secretary to do so—we would then move to the next step of *Chevron*. In a traditional statutory interpretation case, we would defer to the agency's reasonable interpretation of the statute. *Eagle Pharms.*, 952 F.3d at 330. Here, we must also address the intersection between *Chevron* and the Indian Canon, which generally provides that in a case involving Indian law, "statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985). In *Cobell v. Salazar* we explained that:

> *Chevron* deference can be trumped by the requirement that statutes are to be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit. Nonetheless, *Chevron* deference does not disappear from the process of reviewing an agency's interpretation of those statutes it is trusted to administer for the benefit of the Indians, although that deference applies with muted effect. Granted, the Indians' benefit remains paramount. But where Congress has entrusted to the agency the duty of applying, and therefore interpreting, a statutory duty owed to the Indians, we cannot ignore the responsibility of the agency for careful stewardship of limited government resources.

573 F.3d 808, 812 (D.C. Cir. 2009) (internal citations and quotations omitted). *Cobell* suggests that *Chevron*'s "muted effect" supersedes the Indian Canon only in limited contexts.

*Cobell* featured one such context. In *Cobell*, the agency was responsible for "careful stewardship of limited government resources"; we rejected an interpretation that would have prevented Interior from exercising discretion as to the methodology or scope of an accounting of funds of a trust with a "unique nature," *id.* at 812–13—that is, made up mainly of "the proceeds of various transactions in land allotted to individual Indians," *id.* at 809 (internal quotations omitted).

This case is distinguishable from *Cobell* and does not support *Chevron*'s application over the Indian Canon, even with "muted effect." *Cobell* involved a trust that required Interior to conduct an accounting "for the daily and annual balance of all funds held in trust by the United States for the benefit of . . . an individual Indian." *Id.* (internal quotations omitted). We allowed Interior some deference to craft how to "provide the trust beneficiaries the best accounting possible, in a reasonable time, with the money that Congress is willing to appropriate." *Id.* at 813. On the other hand, here the Secretary's duty is relatively straightforward, especially so when we focus on § 108(f): the Secretary must take land into trust for the Sault after it purchases such land using income or interest from the Fund. Further, unlike *Cobell*—which involved management of "limited government resources"—the Secretary's taking of land into trust for the Sault does not require management of similarly limited government resources. Accordingly, the Indian Canon should favor the Sault's reasonable interpretation, without deference to the Secretary's proposed interpretation, even if that interpretation is also reasonable.

Interior also asserts that the Indian Canon does not apply because there are tribes on both sides of the dispute over interpretation. The Indian Canon is rooted in the general trust relationship between the United States Government and

Indians. *Blackfeet Tribe*, 471 U.S. at 766. It makes sense that the Indian Canon defers to the specific tribal beneficiary of a statute (or a signatory to a treaty) versus a third-party tribe. As the district court aptly put it, "[i]t would be strange to construe a statute against the only Tribe it seeks to benefit simply because another Indian tribe objects." *Sault Ste. Marie Tribe*, 442 F. Supp. 3d at 80. Had another beneficiary tribe intervened and argued that the Sault's interpretation of § 108 harmed its MILCSA-protected interest, it would make sense not to defer to either tribe's interpretation. Under Interior's approach, even if the Sault were joined by all other beneficiary tribes under MILCSA, and they agreed on the meaning of an ambiguous MILCSA provision, a third-party tribe's objection to that interpretation would nullify the Indian Canon's applicability. Therefore, even if § 108(f) is ambiguous, the Sault's interpretation of § 108(f) is both permissible and reasonable and we should follow that interpretation under the Indian Canon.

Accordingly, I respectfully dissent.